IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> and <br> LOUISIANA DEPARTMENT OF <br> ENVIRONMENTAL QUALITY, <br><br> Plaintiffs, <br><br> v. <br><br> PCS NITROGEN FERTILIZER, L.P., <br><br> Defendant. | No. <br><br><br><br> CIVIL COMPLAINT |

The United States of America, by authority of the Attorney General of the United

States and through the undersigned attorneys acting at the request of the Administrator of

the United States Environmental Protection Agency ("EPA"), together with the Louisiana

Department of Environmental Quality ("LDEQ"), acting with the concurrence of the

Louisiana Attorney General and through the undersigned attorneys, file this Complaint

and allege as follows:

## NATURE OF THIS ACTION

1.      This is a civil action brought pursuant to Section 3008(a) and (g) of the Resource

Conservation and Recovery Act ("RCRA"), 42 United States Code ("U.S.C.") § 6928(a)

and (g), and pursuant to the Louisiana Environmental Quality Act ("EQA"),

La.R.S.30:2025, and the Louisiana Administrative Code, ("LAC"), 33:V.107 against PCS

Nitrogen Fertilizer, L.P., ("PCS Nitrogen" or "Defendant").  The United States and

LDEQ ("Plaintiffs") seek injunctive relief and the assessment of civil penalties for environmental violations at PCS Nitrogen's fertilizer manufacturing facility, which is located in Louisiana on Highway 3115 between Highways 74 and 75 near Geismar, LA 70734, in Iberville and Ascension Parishes (the "Facility").

2.      As set forth below, Defendant has violated the statutory and regulatory requirements applicable to the management and disposal of solid and/or hazardous waste, found at La. R.S. 30:2171 *et seq.* and Title 33 of the LAC Part V, Chapters 1 through 51, (the corresponding federal citations are Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924 and 6925, and the regulations promulgated thereunder, including (40 C.F.R. Parts 260, 261, 262, 264, 265, 268, and 270).

## PARTIES

3.      Plaintiffs are the United States of America and LDEQ.

4.      Defendant PCS Nitrogen is registered as a limited partnership in the State of Delaware and is licensed to do business in Louisiana.

5.      PCS Nitrogen is, and at all times relevant to this lawsuit has been, the owner and operator of the Facility.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the parties and the subject matter of this action pursuant to RCRA Section 3008(a), 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 1331 (federal question jurisdiction), 1332 (diversity), 1345 (jurisdiction when the United States is a plaintiff), 1355 (jurisdiction over penalties arising under federal claims), and 1367 (supplemental jurisdiction).

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and RCRA Section 3008(a)(1), 42 U.S.C. § 6928(a)(1), because Defendant is located and is doing business in this District and the violations occurred in this District.

8.      Authority to bring this civil action is vested in the Attorney General of the United States and the Administrator of EPA pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 516 and 519.

9.      Authority to bring this civil action is vested in LDEQ with the concurrence of the Louisiana Attorney General pursuant to La.R.S.30:2025, and LAC 33:V.107.

10.     The United States has provided notice to the State of Louisiana prior to the commencement of this action in accordance with RCRA Section 3008(a)(2), 42 U.S.C. § 6928(a)(2).

## STATUTORY AND REGULATORY BACKGROUND

11.     Federal regulation of hazardous waste is primarily based on RCRA, enacted on October 21, 1976 to amend the Solid Waste Disposal Act, and on the Hazardous and Solid Waste Amendments ("HSWA") enacted by Congress in 1984 to further amend the Solid Waste Disposal Act.  RCRA establishes a "cradle-to-grave" program to be administered by the Administrator of EPA and authorized states for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste.  See 42 U.S.C. § 6901 *et seq*.

12.     RCRA's Subchapter III (RCRA §§ 3001-3024, 42 U.S.C. §§ 6921-6939(g), known as "Subtitle C") required EPA to promulgate regulations establishing performance standards applicable to facilities that generate, transport, treat, store, or dispose of

hazardous wastes.  Together, RCRA Subtitle C and its implementing regulations, set forth at 40 C.F.R. Parts 260 – 279, comprise EPA's RCRA hazardous waste program.

13.    RCRA Section 3006, 42 U.S.C. § 6926, allows the Administrator to authorize a state to administer its own hazardous waste program in lieu of the federal program when the Administrator deems the state program to be equivalent to and consistent with the federal program.

14.    On January 24, 1985, the State of Louisiana received final authorization for its base Hazardous Waste Management Program (50 Fed. Reg. 3348).  Pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), the state of Louisiana was granted final authorization by EPA to administer and enforce a hazardous waste program on February 7, 1985 (50 Fed. Reg. 3348).  LDEQ is the designated state agency to implement the authorized RCRA program in Louisiana.

15.    Subsequent revisions have been made to the Louisiana Hazardous Waste Program and authorized by EPA. Except as otherwise provided, all citations found within this Complaint are to the "EPA-Approved Louisiana Statutory and Regulatory Requirements Applicable to the Hazardous Waste Management Program" dated November 2015, incorporated by reference under 40 C.F.R. § 272. 951(c)(1)(i), effective on December 26, 2018. 83 Fed. Reg. 66143 (December 26, 2018); 40 C.F.R. 272. 951; Louisiana State-Administered Program: Final Authorization.  In July 2020, the LDEQ promulgated new regulations and re-codified existing regulations applicable to generators of hazardous waste resulting in the migration of specific hazardous waste generator regulations from LAC 33:V.Chapter 11 into LAC 33:V.Chapter 10.  Therefore, due to the dates of allegations herein, regulatory citations included in this document may differ from

analogous regulatory citations in the current Louisiana Hazardous Waste Code (LAC 33: Part V). The corresponding C.F.R. citations are also provided.

16.    Pursuant to its authority under Subtitle C of RCRA, 42 U.S.C. § 6922(a), EPA has promulgated regulations applicable to solid and hazardous waste generators at 40 C.F.R. Parts 261 and 262; to owner/operators of hazardous waste facilities at 40 C.F.R. Parts 264 and 265; and to land disposal of solid and hazardous waste at 40 C.F.R. Part 268. LDEQ, like EPA, has promulgated regulations applicable to these persons and practices, which are found at Title 33 of the LAC Part V, Chapters 1 through 51. Unless specified otherwise, LDEQ has incorporated by reference all federal regulations cited in this Complaint.

17.    Although EPA has granted the State authority to enforce its own hazardous waste program, EPA retains jurisdiction and authority to initiate an independent enforcement action, pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

18.    As the authorized provisions of Louisiana's hazardous waste program operate in lieu of the federal RCRA program, the citations for the violations of those authorized provisions alleged herein will be the authorized Louisiana program; however, for ease of reference, the federal citations will follow in parentheses.

19.    LAC 33:V.109, (40 C.F.R. § 261.2), defines a "solid waste" as any discarded material that is not otherwise excluded under LAC 33:V.105.D, (40 C.F.R. § 261.4(a)), or that is not excluded by variance. A material is discarded if it is abandoned (and not used, re-used, reclaimed, or recycled) by being disposed of, or burned or incinerated, except where the material is being burned as a fuel for the purpose of recovering usable energy; or physically, chemically, or biologically treated (other than burned or incinerated) in lieu

of or prior to being disposed of.  Materials are solid waste, as defined in LAC 33:V.109, (40 C.F.R. § 261.2), if they are abandoned by being disposed of, burned or incinerated, or accumulated, stored, or treated (but not recycled) before, or in lieu of, being abandoned by being disposed of, burned, or incinerated.

20.    A solid waste is a hazardous waste if it is not excluded from regulation as a hazardous waste under LAC 33:V.109, (40 C.F.R. § 261.4(b)), and it exhibits any of the characteristics of hazardous waste identified in LAC 33:V.109, (40 C.F.R. Part 261, Subpart C), or it is listed in LAC 33:V.109, (C.F.R. Part 261, Subpart D).

21.    Characteristic hazardous wastes are assigned "D" codes in LAC 33:V.4903, (40 C.F.R. Part 261, Subpart C) depending on the specific hazardous characteristic that the waste exhibits.  A hazardous waste with a pH of less than or equal to 2.0 or greater than or equal to 12.5 exhibits the characteristic of corrosivity and is assigned the D002 hazardous waste code. A hazardous waste that exhibits the characteristic for toxicity has a specific EPA waste code that corresponds to the toxic contaminant pursuant to LAC 33:V.4903.C and E (40 C.F.R. §§ 261.22 and 261.24).

22.    Certain solid wastes from the extraction, beneficiation, and processing of ores and minerals to generate a saleable product ("mineral processing") are excluded from the definition of hazardous wastes pursuant to LAC 33:V.105.D.2(h), (40 C.F.R. § 261.4(b)(7)) (the "Bevill Exclusion").

23.    "Materials that are saleable, either as raw materials to other types of industrial processes (*e.g.* chemical manufacturing such as Poly-N) or as finished products, are considered final products." [54 Fed. Reg. 36,620, September 1, 1989].

24.     While the first saleable product for the phosphoric acid industry is typically clarified 52% to 54% phosphoric acid with less than 1% solids, which is known as merchant grade acid ("MGA"), EPA made it clear during the 1990 rule-making that the Bevill Exclusion can end before MGA is produced if intermediate mineral products are used as feedstocks to other industrial processes, such as Ammonium Phosphate fertilizer. *Id*.

25.      For a mineral processing waste to be excluded under the Bevill Exclusion, it must fall into one of the twenty specific categories of excluded wastes listed at LAC 33:V.105.D.2(h)(ii), (40 C.F.R. § 261.4(b)(7)(ii)(D)).

26.     The Bevill Exclusion applies to only two wastes generated from phosphoric acid mineral processing operations: "(p)hosphogypsum from phosphoric acid production," LAC 33:V.105.D.2(h)(ii)(d), (40 C.F.R. § 261.4(b)(7)(ii)(D)), and "process wastewater from phosphoric acid production" operations through concentration to MGA.  LAC 33:V.105.D.2(h)(ii)(p), (40 C.F.R. § 261.4(b)(7)(ii)(P)).

27.     Chemical manufacturing wastes, cleaning wastes, air pollution control device ("scrubber") wastes, and wastes generated after production of the first saleable product (or intermediate products routed to chemical processing) are not "process wastewater from phosphoric acid production" and do not qualify for the Bevill Exclusion.

28.     When Bevill-excluded phosphogypsum and process wastewater from phosphoric acid production are mixed with hazardous non-excluded wastes, if the resulting mixture continues to exhibit a hazardous characteristic of the non-excluded waste, then the entire mixture is a hazardous waste pursuant to the Bevill Mixture Rule, promulgated at LAC 33:V.109, (40 C.F.R. § 261.3(a)(2)(i)).

29.     In addition, if a Bevill-excluded waste is mixed with a listed hazardous waste, the resultant mixture is a listed hazardous waste pursuant to LAC 33:V.109, (40 C.F.R. § 261.3(a)(2)(i)).

30.     LAC 33:V., Chapters 15 and 43, (C.F.R. Parts 264 and/or 265) apply to owners and operators of facilities that treat, store and/or dispose of hazardous waste.

31.     EPA's and LDEQ's regulations (as relevant to this lawsuit) require that generators of solid waste and hazardous waste must, among other things:

    a.   Determine whether generated solid wastes are hazardous, LAC 33:
V.1103, (40 C.F.R. § 262.11);

    b.   Keep records of hazardous waste determinations, LAC 33:V.1111.A.3,
(40 C.F.R. § 262.40(c));

    c.   Treat, store, and dispose of hazardous waste in compliance with a permit and other applicable regulatory requirements, or, if they qualify for interim status, with interim status requirements, including obtaining financial assurance where applicable, LAC 33:V.Chapter 3, (Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), 40 C.F.R. § 270), and;

    d.   Meet certain requirements for waste treatment prior to placement or disposal of hazardous waste on the land, LAC 33:V., Chapter 22 Subchapter A, (40 C.F.R. Part 268).

32.     Pursuant to Sections 3008(a) and (g) and 3006(g) of RCRA, 42 U.S.C. §§ 6928(a) and (g) and 6926(g), the United States may enforce the federally-approved Louisiana hazardous waste program, as well as the federal regulations that remain effective in Louisiana, by filing a civil action in United States District Court seeking civil penalties

not to exceed $25,000 per day per violation (prior to January 30, 1997) and injunctive relief.

33.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and as provided in 40 C.F.R. Part 19, the amount specified in the foregoing Paragraph increases to $27,500 per day for each violation occurring on and after January 31, 1997, further increases to $32,500 per day for each violation occurring on or after March 15, 2004, further increases to $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015, and further increases to $75,867 per day for each violation occurring after November 2, 2015, and assessed on or after January 13, 2020, and further increases to $81,540 per day for each violation occurring after November 2, 2015 and assessed on or after January 12, 2022.  Each day of such violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

34.     Pursuant to La.R.S.30:2025(E)(1)(a), LDEQ is authorized to enforce its hazardous waste regulations and to seek judicial imposition of penalties of up to $32,500 per day for each violation.

## THE PCS NITROGEN FACILITY AND PROCESS DESCRIPTION

35.     At all times relevant to this Complaint, Defendant owned and operated the Facility.. The Facility consisted of two connected and related sites:

    a.     The main plant, including the phosphoric acid manufacturing plant, has operated since 1967 and covers approximately1050 acres.  The main plant is located along the East Bank of the Mississippi River at River Mile 187;

b.      Amongst various operations and activities at the main plant, PCS Nitrogen operates or operated a sulfuric acid production plant, a phosphoric acid plant, and a nitrogen products plant;

c.      In June 2015, PCS Nitrogen ceased operation of the sulfuric acid production plant;

d.      In December 2018, PCS Nitrogen ceased operation of the phosphoric acid production plant; and

e.      PCS Nitrogen disposed of certain wastes from the main plant in phosphogypsum stacks ("Phosphogypsum Stacks"), which are located between Highway 30 & Highway 3115, Geismar, LA 70734.

36.     Operations at the Facility that generated wastes fall in several categories, only some of which constitute mineral processing under RCRA.

**Former Phosphate Area**

37.     The phosphate area of the main plant contained two production plants: the sulfuric acid plant; and the phosphoric acid plant. Chemicals produced at the sulfuric acid plant include sulfuric acid, oleum, and chlorosulfonic acid.  The phosphoric acid and sulfuric acid plants have been decommissioned and dismantled.  The chemicals that were produced at the phosphoric acid plant included phosphoric acid, super phosphoric acid ("SPA"), and ammonium poly-phosphate ("Poly-N").  The production processes involved the use of several tanks, tanks systems, lagoons, and equipment, as further described below.

**Former Sulfuric Acid Operations**

38.    PCS Nitrogen purchased elemental sulfur on the commercial market.  The sulfur was delivered to the Facility via barge or truck.

39.    Liquid elemental sulfur was passed through a sulfur burner, where sulfur was converted to $SO_2$ by burning it in forced excess air.  $SO_2$ produced in the sulfur burner reacted with oxygen ($O_2$) from the air in presence of a catalyst (Vanadium pentoxide [$V_2O_5$]) in a convertor to form sulfur trioxide ($SO_3$).  The $SO_3$ produced flows into an absorbing tower, where it was dissolved in concentrated sulfuric acid ("$H_2SO_4$") to form fuming sulfuric acid (or oleum).  Subsequently, oleum was reacted with water to produce concentrated sulfuric acid.

40.    The sulfuric acid plant also produced chlorosulfonic acid ("CSA") by reacting anhydrous hydrochloric acid ("HCl") with $SO_3$.

41.    Production of chlorosulfonic acid is a chemical manufacturing process, not a mineral processing activity, and wastes generated by this process are not subject to the Bevill Exclusion.

42.    Concentrated sulfuric acid was used on-site, shipped to neighboring facilities, and sold on the open market.  Oleum from the manufacturing process was also sold to neighboring facilities.

43.    PCS Nitrogen also used sulfuric acid to clean production and storage equipment, mainly pipes and tanks.

44.    Cleaning with sulfuric acid as a cleaning agent is not a mineral processing activity, and cleaning wastes generated thereby are not subject to the Bevill Exclusion.

**Former Phosphoric Acid Operations**

45.    Washed phosphate rock was conveyed to an agitated, multi-compartment reactor (also known as an "Attack Tank") where sulfuric acid and recycled phosphoric acid were added to digest the phosphate rock, producing a slurry of phosphoric acid and a by-product, hemi-hydrate phosphogypsum.  Fluorine emissions from the Attack Tank were controlled by a fume scrubber.

46.    The slurry was sent to a tilting pan filter (also known as a "Prayon Filter") where the 40% $P_2O_5$ phosphoric acid was separated from the solid hemi-hydrate gypsum.  The filtered solids were washed in three stages to recover residual phosphoric acid from the gypsum solids.

47.    The hemi-hydrate gypsum was converted to the more stable di-hydrate gypsum in two transformation tanks using sulfuric acid (or a substitute for sulfuric acid).  The washed gypsum from the filter was sluiced with process wastewater (addressed below) down a chute to the 'A' Transformation Tank.  Sulfuric acid or Raffinate (which contains 15% to 20% sulfuric acid), a by-product stream from a neighboring plant was added to the agitated A Transformation Tank.  This tank overflowed to the agitated 'B' Transformation Tank.  The B Transformation Tank overflowed to the Gypsum Slurry Tank from which the gypsum slurry was pumped through a pipeline to the Phosphogypsum Stacks and decanted to the Active Clearwell.

48.    The 40% - Phosphorus Pentoxide granular ("$P_2O_5$") acid from the filter was pumped to the Day Tank (know as well as the "40% Tank").  This tank overflow fed the 1st stage evaporators (also called the weak evaporators).  The underflow (high solids acid)

from this tank was pumped back to the reactor to recover additional phosphoric acid. The acid concentration leaving the weak evaporation stage was typically 50 to 54% $P_2O_5$.

49.     The product acid from the evaporators was pumped to the #4 Storage Tank for solids removal. The overflow from this tank was usually pumped to the #3 Storage Tank for additional solids removal. The 54% acid from the #3 Storage Tank was pumped to one of three "strong" acid evaporators. The strong acid evaporator product, which contains up to 62% $P_2O_5$, was pumped to the #2 Storage Tank. The overflow from this tank was pumped to the #1 Storage Tank.

50.     The acid overflow from the #1 Storage Tank was the final mineral processing product, called GQ-54. The underflow from both #1 and #2 Storage Tanks was pumped back to the 40% Tank for additional phosphoric acid recovery.

51.     Super Phosphoric Acid ("SPA") was also produced in the process by passing the 60% phosphoric acid through a natural gas-fired burner. The phosphoric acid was converted into a gas then hydrated in an entrainment separator. SPA was filtered through pressure filters and mixed with clarified water to produce 73% phosphoric acid, which was sold commercially as SPA on the open market.

52.     SPA was also reacted with ammonia to produce another chemical product called Poly-N, which was also sold commercially. Poly-N was produced by reacting SPA with ammonia in a pipe reactor to produce an ammonium phosphate compound (1.5:1 ammonia:phosphate).

53.     The SPA production unit used a Dynawave fume scrubber to treat residual fluorides and carbon monoxide ("CO"). A built-in mist eliminator in the Dynawave fume scrubber captures emissions before emitting gases to the atmosphere.

54.    Contaminants were accumulated in the water used throughout production of phosphoric acid, resulting in aqueous wastes referred to as "process wastewater."  Prior to reuse in the various processes, the process wastewater must be cooled, and contaminants and solids must be removed.  Most of the solids and contaminants precipitated (settle) from the water in the Phosphogypsum Stacks.  The water was decanted from the Phosphogypsum Stacks to the Active Clearwell.

55.    Process wastewater was cooled in a forced draft cooling tower.  Process wastewater from the Active Clearwell was pumped to the cooling tower basin.  This process wastewater was then pumped to the Flash Cooler barometric condensers and to the evaporator barometric condensers and inter-condensers.

56.    The process wastewater used at the Flash Cooler and #1 Evaporator flowed to the Filter Wash Tank.  Water from this tank was used at the Tilting Pan Filter for gypsum sluice water, final filter wash, and for high pressure spray cloth wash.  Excess water flowed to the Effluent Tank where it combined with water from the #2 and #4 evaporators.  This water was returned to the cooling tower and used as make-up water in the Prayon Filter wash-down tank.

57.    The plant had one gypsum line and two process wastewater return lines.  The wastewater lines could serve as a gypsum line if the main gypsum line needed to be cleaned, unplugged or repaired.

58.    From at least August 2004 until December 2012, PCS Nitrogen sold 60% phosphoric acid to Innophos Inc., a neighboring facility, which it transfered by pipe.  Prior to 2017, when Innophos, Inc. settled alleged RCRA violations through a Consent Decree, Innophos, Inc. returned two waste streams from its operations to PCS Nitrogen's

phosphoric acid plant.  One waste stream was called Raffinate and the other was called Dearsenate. The return of Raffinate and Dearsenate to PCS Nitrogen ceased following entry of the Innophos Consent Decree.

59.     PCS Nitrogen mixed the Raffinate with the slurried phosphogypsum in the A Transformation Tank for use as a substitute for sulfuric acid.  Raffinate was subsequently discharged to PCS Nitrogen's Phosphogypsum Stack and associated impoundments and other units ("Phosphogypsum Stack System") along with the phosphogypsum and process wastewater slurry in the Active Clearwell.

60.     PCS Nitrogen stored approximately 20,000 gallons per day of Dearsenate in Tank #203 before discharging the Dearsenate to the Phosphogypsum Stacks via the Gypsum Slurry Tank.

61.     Production of Purified Phosphoric Acid is a chemical manufacturing process, not a mineral processing activity, and wastes generated from this process are not subject to the Bevill Exclusion.

### Spills & Leaks of Phosphoric Acid

62.     Spills and leaks of phosphoric acid occurred at various areas of the Facility. Product phosphoric acid spills were reclaimed by placing the material in the Day Tank. Residuals washed down from spills were pumped to the Phosphogypsum Stacks.  PCS Nitrogen pumped commingled spills and leaks of phosphoric acid and process wastewater from the production areas to the Phosphogypsum Stacks.  Spills and leaks of process wastewater occurred at and from the Active Clearwell, Inactive Clearwell, and from other areas of the Facility and Phosphygypsum Stacks, and have migrated beyond the perimeter ditches and the Facility footprint.

63.     Spills and leaks of phosphoric acid are not part of mineral processing and wastes generated from spills and leaks are therefore not subject to the Bevill Exclusion.

**Railcar Cleaning**

64.     PCS Nitrogen used railcars to transport GQ-54 to customers.

65.     When the railcars are returned for reloading, they were first cleaned by PCS Nitrogen to remove residual acid and precipitated solids.  This cleaning was done by inserting a revolving nozzle into the tank car and using clarified water to flush acid and solids out of the car.  This liquid was recirculated until the solids concentration required the mixture be replaced with fresh water.

66.     The resulting cleaning water containing high solids was then sent to a Lagoon Sump and was subsequently pumped to the gypsum pump tank.

67.     The cleaning of railcars is not part of mineral processing, and such cleaning wastes are not subject to the Bevill Exclusion.

**Phosphogypsum Stack System**

68.     PCS Nitrogen's Phosphogypsum Stack System is located two miles north of the production/manufacturing plant.  Stacking began in the late 1960s.

69.     The Phosphogypsum Stacks are designated pursuant to the LPDES permit as Active (phosphogypsum is being deposited into the Phosphogypsum Stack) and Inactive (Phosphogypsum Stack no longer receiving phosphogypsum).

70.     Two large lined surface impoundments, known as the Active and Inactive Clearwells, are located west of the Phosphogypsum Stacks.  Newly-generated phosphogypsum was placed on top of previously disposed phosphogypsum in the Active Phosphogypsum Stack using the Active Clearwell for cooling and settlement of

contaminants and solids.  Process wastewater from the Active Clearwell was returned to the production/manufacturing plant, via pipeline, for re-use in the phosphoric acid production process.

71.    Stormwater run-off and leachate from the Inactive Phosphogypsum Stacks is collected in perimeter ditches and directed to the Inactive Clearwell.  Wastewater from the Inactive Clearwell can be discharged to the Mississippi River without treatment from Outfall 001, via Internal Outfall 301, pursuant to a Louisiana Pollutant Discharge Elimination System ("LPDES") Permit No. LA0066257.  Process wastewater (i.e. wastewater from the active impoundment system) is only authorized to be discharged to the Mississippi River to Outfall 001 after treatment via Internal Outfall 201 except under emergency conditions described in the LPDES permit.

### Permits

72.    LDEQ has issued PCS Nitrogen an LPDES Permit No. LA0066257 pursuant to its authorized CWA program.  The LPDES Permit is renewed every five years, and most recently on January 1, 2016.  PCS Nitrogen timely submitted an application to revoke and reissue the LPDES permit in August 2019.  The Facility also has a Solid Waste Permit, Permit number No. P-0201R2, as modified, which allows general plant waste from various operations throughout the Facility to be disposed of at Gyp Stack 7.  The Solid Waste Permit is authorized by the LDEQ and requires sampling of PCS Nitrogen's ground water wells.

## GENERAL RCRA ALLEGATIONS

73.    Defendant PCS Nitrogen is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15), which includes corporations; and within the meaning of LAC 33:V.109, (40 C.F.R. § 260.10).

74.    Defendant PCS Nitrogen is an "owner" and "operator" of the Facility within the meaning of LAC 33:V.109, (40 C.F.R. § 260.10).

75.    The phosphogypsum generated at the Facility meets the definition of "(p)hosphosypsum from phosphoric acid production" at LAC 33:V.105.D, (40 C.F.R. § 261.4(b)(7)(ii)(D)) and is therefore a Bevill-excluded waste.  Wastewaters generated at the Facility from phosphoric acid production processes, including non-ammoniated animal feed ingredients are also Bevill-excluded pursuant to LAC 33:V.105.D, (40 C.F.R. § 261.4(b)(7)(ii)(P)).

76.    Wastewaters generated at the Facility from processes associated with chlorosulfonic acid production, among others (chemical manufacturing), certain air pollution control scrubbers, and pipe, tank, or other process equipment cleaning and maintenance wastes, and railcar cleaning wastes are not Bevill-excluded process wastewater.  When these non-excluded wastes at the PCS Nitrogen Facility exhibit a hazardous characteristic pursuant to LAC 33:V.4903.C and E (40 C.F.R. Part 261, Subpart C) they are hazardous wastes.

77.    When hazardous wastes identified in Paragraph 76 are mixed with Bevill-excluded phosphogypsum and process wastewater from phosphoric acid production, if the resulting mixture continues to exhibit a hazardous characteristic of the non-excluded

waste, then the entire mixture is a hazardous waste pursuant to the Bevill Mixture Rule, promulgated at LAC 33:V.109, (40 C.F.R. § 261.3(a)(2)(i)).

78.    Since 2004, Defendant has owned, and/or operated, and continues to own and/or operate a "solid waste management facility" at the Facility within the meaning of LAC 33:V.109, (Section 1004(29) of RCRA, 42 U.S.C. § 6903(29)).

79.    In February 2004 and April 2005, EPA conducted Compliance Evaluation Inspections ("CEIs") at the Facility to determine Defendant's compliance with applicable State and Federal RCRA requirements.  EPA also issued an Information Request to PCS pursuant to Section 3007 of RCRA on March 5, 2007. EPA received responses from PCS Nitrogen in May 2007, August 2007, and November 2007.  EPA supplemented its Information Request in November 2007 and received a response from PCS Nitrogen in February 2008.

80.    In December 2017, EPA conducted a site visit to gather samples for analysis at the Facility to assess Defendant's ongoing operations and compliance with applicable State and Federal RCRA requirements.

## CLAIMS FOR RELIEF

*First Claim for Relief*
*(Failure to Make Hazardous Waste Determinations at the PCS Nitrogen Facility)*

81.    The allegations in Paragraphs 1-80 are re-alleged and incorporated herein by reference.

82.    Pursuant to LAC 33:V.1103, (40 C.F.R. § 262.11), Defendant, as a generator of solid waste, is required to make a hazardous waste determination as to those wastes.

83.     At the time of the February 2004 and April 2005 CEIs, Defendant routinely generated the following solid wastes for which hazardous waste determinations were not made:

      a.      Railcar Cleaning Wastes;

      b.      Process Plant Cleaning Wastes (e.g., phosphoric acid storage tank clean-out wastes, SPA storage tank clean-out wastes, evaporator clean-out wastes, cooling tower sludges);

      c.      Process wastewater/scrubber wastes;

      d.      Phosphoric acid spill wastes – all corrosive wastes released from process areas of the Facility or disposed in the Phosphogypsum Stack System;

      e.      Corrosive liquid wastes discharged to the perimeter ditch at the chlorosulfonic acid unit at the sulfuric acid plant; and

      f.      Spills and leaks from the Phosphogypsum Stack System that have migrated outside of the permitted footprint of the Phosphogypsum Stack System.

84.     Based on EPA's knowledge of the processes at the Facility, the results of the February 2004 and April 2005 CEIs, Defendant's response to the RCRA 3007 Information Request, and EPA's 2017 site visit, EPA determined the following solid wastes are hazardous waste pursuant to LAC 33:V.109, (40 C.F.R. §§ 261.22 and 261.24), for D002 for corrosivity; D004 for arsenic; D006 for cadmium; and/or D007 for chromium:

    a.    Railcar Cleaning Wastes;

    b.    Process Plant Cleaning Wastes (e.g., phosphoric acid storage tank clean-out wastes, SPA storage tank clean-out wastes, evaporator clean-out wastes, cooling tower sludges);

    c.    Process wastewater/scrubber waste;

    d.    Phosphoric acid spills – all corrosive wastes released from process areas of the Facility or disposed in the Phosphogypsum Stack System;

    e.    Corrosive liquid discharged to the perimeter ditch at the chlorosulfonic acid unit at the sulfuric acid plant; and

    f.    Spills and leaks from the Phosphogypsum Stack System that have migrated outside of the permitted footprint of the Phosphogypsum Stack System.

85.    Defendant has violated the applicable regulatory requirements of the LAC 33:V.1103 (40 C.F.R. § 262.11), by failing to make the requisite hazardous waste determination for the solid waste streams listed in Paragraph 84 above.

86.    Defendant is liable for injunctive relief and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and La.R.S.30:2025 for each day that it failed to make a hazardous waste determination for each solid waste generated at its Facility.

*Second Claim for Relief*
*(Failure to Perform Land Disposal Determination at the PCS Nitrogen Facility)*

87.    The allegations in Paragraphs 1-86 are realleged and incorporated herein by reference.

88.    Pursuant to LAC 33:V.2245, (40 C.F.R. § 268.7(a)(1)), Defendant is required, among other things, to determine if its hazardous wastes must be treated before they can be land disposed.

89.    Since at least February 2004 and continuing to at least February 2019, Defendant has routinely generated the following hazardous wastes and failed to determine if these wastes must be treated before they can be land disposed:

   a.    Railcar Cleaning Wastes;

   b.    Process Plant Cleaning Wastes (e.g., phosphoric acid storage tank clean-out wastes, SPA storage tank clean-out wastes, evaporator clean-out wastes, cooling tower sludges);

   c.    Process wastewater/scrubber waste;

   d.    Phosphoric acid spills – all corrosive wastes released from process areas of the Facility or disposed in the Phosphogypsum Stack System; and

   e.    Corrosive liquid discharged to the perimeter ditch at the chlorosulfonic acid unit at the sulfuric acid plant.

   f.    Spills and leaks from the Phosphogypsum Stack System that have migrated outside of the permitted footprint of the Phosphogypsum Stack System .

90.    Defendant has violated LAC 33:V.2245, (40 C.F.R. § 268.7(a)(1)), by failing to determine whether hazardous wastes it generated at its Facility must be treated before they can be land disposed.

91.    Defendant is liable for injunctive relief and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and La.R.S.30:2025 for each day that it failed to determine if hazardous wastes generated at its Facility must be treated prior to land disposal.

<u>Third Claim for Relief</u>
*(Storage of Hazardous Waste Without a Permit or Interim Status)*

92.    The allegations in Paragraphs 1-91 are re-alleged and incorporated herein by reference.

93.    Pursuant to LAC 33:V.303.B, 305 and 501, (RCRA Section 3005(a), 42 U.S.C. § 6925(a), 40 C.F.R. Part 264 and §§ 270.1 and 270.10), among other things, Defendant the owner and operator of a hazardous waste management unit must have a permit or interim status for the treatment, storage and/or disposal of any hazardous waste during the active life of the unit.

94.    Since at least February 2004 and continuing through 2012, Defendant routinely accepted and stored Dearsenate generated by a neighboring third-party generator, Innophos, Inc.

95.    During this time, the Dearsenate typically exhibited a pH below 1.0 and contained concentrations of cadmium and chromium above regulatory limits.  The Dearsenate also contained arsenic above regulatory limits.

96.    Pursuant to LAC 33:V.109 and 303.B, (40 C.F.R. §§ 261.22 and 261.24), Dearsenate is a hazardous waste that exhibits the characteristics for corrosivity and toxicity and carries the following EPA's hazardous wastes codes: D002 for corrosivity; D004 for arsenic; D006 for cadmium; and D007 for chromium.

97.     From the results of the February 2004 and April 2005 CEIs and the responses to

the EPA's Information Request, EPA determined that since at least February 2004 and

continued through 2012 Defendant stored Dearsenate in its holding tank #203.

98.     At all times relevant to this Complaint, PCS Nitrogen did not have a permit or

interim status pursuant to the requirements of LAC 33:V. Chapters 3 and 5, (40 C.F.R.

Part 264 and §§ 270.1 and 270.10), allowing PCS Nitrogen to store hazardous waste at

the Facility.

99.     Defendant has violated Section 3005 of RCRA, 42 U.S.C. § 6925, and the

applicable regulatory requirements of LAC 33:V.303.B, 305 and 501, (40 C.F.R. Part 264

and §§ 270.1 and 270.10).

100.    Defendant is liable for injunctive relief and civil penalties pursuant to

Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and La.R.S.30:2025 for each day that it

stored Dearsenate in each tank at its Facility without a permit or interim status.

*Fourth Claim for Relief*
*(Treatment, Storage, and Disposal of Hazardous Waste in the PCS Nitrogen*
*Phosphogypsum Stack System, Surface Impoundments, and Tanks, and Leaking/Disposal*
*of Hazardous Wastes Outside the Phosphogypsum Stack System, Without a Permit or*
*Interim Status)*

101.    The allegations in Paragraphs 1-100 are re-alleged and incorporated herein by

reference.

102.    Pursuant to LAC 33:V.303.B, 305, and 501, (RCRA Section 3005(a), 42 U.S.C. §

6925(a), 40 C.F.R. Part 264 and §§ 270.1 and 270.10 ), Defendant as the owner and

operator of a hazardous waste management unit must, in addition to other requirements,

have a permit or interim status for the treatment, storage and/or disposal of any hazardous

waste during the active life of the unit.

103.    At all times relevant to this Complaint, PCS Nitrogen did not have a permit or interim status pursuant to the requirements of LAC 33:V.Chapters 3 and 5, (40 C.F.R. Part 264 and §§ 270.1 and 270.10), allowing PCS Nitrogen to treat, store, and/or dispose of hazardous waste.

104.    Since at least February 2004 and continuing through 2012, a neighboring third-party generator, Innophos Inc., routinely piped and/or shipped its hazardous waste streams of Raffinate and Dearsenate to the Facility, where PCS Nitrogen disposed of the hazardous waste streams, either directly or indirectly, into its Phosphogypsum Stack System.

105.    The Raffinate and Dearsenate typically exhibit a pH below 1.0 and contain concentrations of cadmium and chromium above regulatory limits.  The Dearsenate also contains arsenic above regulatory limits.

106.    Pursuant to LAC 33:V.109, (40 C.F.R. §§ 261.22 and 261.24), Raffinate and Dearsenate are hazardous waste that exhibit the characteristics for corrosivity and toxicity and carry the following EPA's hazardous wastes codes: D002 for corrosivity; D004 for arsenic; D006 for cadmium; and D007 for chromium.

107.    At all times relevant to this Complaint, PCS Nitrogen also disposed of the hazardous waste streams itemized in Paragraph 89 above of this Complaint directly or indirectly into its Phosphogypsum Stacks.

108.    At all times relevant to this Complaint, Defendant has operated its Facility's Phosphogypsum Stack System, its surface impoundments, and tank(s) as hazardous waste management units, and they are subject to the hazardous waste requirements at LAC.33:V.Subchapter C, (40 C.F.R. Part 264, Subparts A-G, J and K).

109.    Defendant has violated Section 3005 of RCRA, 42 U.S.C. § 6925, and the applicable regulatory requirements of LAC 33:V.303.B, 305 and 501 (40 C.F.R. Part 264 and §§ 270.1, 270.10).

110.    Defendant is liable for injunctive relief and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and the, La.R.S.30:2025 for each day that it treated, stored, and/or disposed of hazardous waste in its Phosphogypsum Stack System, re-circulating ditches, and surface impoundment(s) at its Facility without a permit or interim status.

### Fifth Claim for Relief
*(Failure to Submit Annual Reports to the LDEQ)*

111.    The allegations in Paragraphs 1-110 are re-alleged and incorporated herein by reference.

112.    Pursuant to LAC 33:V.1529.D., the owner and operator of a treatment, storage, and disposal facility shall prepare and submit a single copy of an annual report to the Office of Environmental Services by March 1 of each year to cover the preceding year's activities.  The treatment, storage, and disposal facility is required to report to the administrative authority prescribed information about the description of its hazardous waste received from off-site for treatment, storage, and/or disposal, including the identifying information about the generator of the hazardous waste; and the identifying information about the quantity of hazardous waste received and the method of treatment, storage, and/or disposal of each hazardous waste received.

113.    At all times relevant to this Complaint, LDEQ, as the administrative authority, received no annual reports from PCS Nitrogen as required by LAC 33:V.1529.D.

114.    Based on EPA's review of PCS Nitrogen's record at LDEQ, PCS Nitrogen did not file the required annual reports regarding PCS Nitrogen's hazardous waste activities, including its receipt of Raffinate and Dearsenate hazardous wastes received from a neighboring third-party generator.

115.    Defendant, by its failure to submit annual reports of its hazardous waste activities to LDEQ, has violated the applicable regulatory requirements of LAC 33:V.1529.D.

116.    Defendant is liable for injunctive relief and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and La.R.S.30:2025 for each such failure to submit annual reports of its hazardous waste activities to LDEQ.

<u>Sixth Claim for Relief</u>
*(Failure to Establish Adequate Cost Estimate for Closure of all units that received hazardous waste at the PCS Nitrogen Facility)*

117.    The allegations in Paragraphs 1-116 are re-alleged and incorporated herein by reference.

118.    Pursuant to LAC 33:V.3705.A, (40 C.F.R. § 264.140(a)), each owner or operator is required to meet the requirements of LAC 33:V.3705, (40 C.F.R. § 264.142), (Cost Estimate for Closure).

119.    Pursuant to  LAC 33:V.3705.A, (40 C.F.R. § 264.142(a)), each owner or operator must have a detailed written estimate, in current dollars, of the cost of closing the facility in accordance with the requirements in LAC 33:V. 3501-3517 and applicable closure requirements for hazardous waste in LAC 33:V.1803, 1915, 2117, 2119, 2315, 2521, 2719, 2911, 3121, and 3203-3207, (40 C.F.R. §§ 264.111 through 264.115 and the applicable closure requirements in 40 C.F.R. §§ 264.142(a) and 264.197 for hazardous waste).

120.    Since at least the February 2004 and continuing until April 13, 2022, Defendant had not established adequate cost estimates for closure of its hazardous waste units at its Facility.

121.    Defendant violated LAC 33:V.3501-3517 and the applicable closure requirements in LAC 33:V. 1803, 1915, 2117, 2119, 2315, 2521, 2719, 2911, 3121, and 3203-3207, (40 C.F.R. §§ 264.111 through 264.155, and the applicable closure requirements in 40 C.F.R. §§ 264.142(a) and 264.197 for hazardous waste).

122.     Defendant is liable for injunctive relief and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and the La.R.S.30:2025 for each day that it failed to establish adequate cost estimate for the closure of its hazardous waste units at its Facility.

*Seventh Claim for Relief*
*(Failure to Establish Adequate Financial Assurance for Closure of all units that received hazardous waste at the PCS Nitrogen Facility)*

123.    The allegations in Paragraphs 1-122 are re-alleged and incorporated herein by reference.

124.    Pursuant to LAC 33:V.3707, (40 C.F.R. § 264.140 (a)), each owner or operator of a treatment, storage, and disposal facility must establish financial assurance for closure of the facility (Financial Assurance for Closure).

125.    Pursuant to LAC 33:V.Chapter 37, (40 C.F.R. § 264.143(a)), the owner or operator must choose from the options set forth at LAC 33:V.3707.A-F (40 C.F.R. §§ 264.143(a) through (f)).

126.    Since at least the February 2004 and continuing at least through the date of the filing of this Complaint, Defendant had not established adequate financial assurance for closure of its hazardous waste units at its Facility.

127.    Defendant has violated the requirements of LAC 33:V. 3707.A-F, (40 C.F.R. §§ 264.143(a) through (f)).

128.    Defendant is liable for injunctive relief and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and the La.R.S.30:2025 for each day that it failed to establish adequate financial assurance for closure of its hazardous waste units at its Facility.

*Eighth Claim for Relief*
*(Failure to Prepare an Adequate Cost Estimate for Post-Closure of all units that received hazardous waste at the PCS Nitrogen Facility)*

129.    The allegations in Paragraphs 1-128 are re-alleged and incorporated herein by reference.

130.    Pursuant to LAC 33:V.3709.A, (40 C.F.R. 40 C.F.R. § 264.140(b)), each owner or operator of a disposal surface impoundment, disposal miscellaneous unit, land treatment unit, or landfill unit, or of a surface impoundment or waste pile must prepare cost estimate for post-closure of its facility to meet the requirements of LAC 33:V.2315 and 2911, (40 C.F.R. § 264.144) (Cost Estimate for Post-Closure Care).

131.    Pursuant to LAC 33:V.3709.A, (40 C.F.R. § 264.144(a)), the owner or operator must prepare a detailed written estimate, in current dollars, of the annual cost of post-closure monitoring and maintenance of the facility in accordance with LAC 33:V.3519, 3527, 2315, 2521, 2719, 2911, and 3207, (40 C.F.R. §§ 264.177 through 264.120, and 40 C.F.R. § 264.288).

132.    Since at least February 2004 and continuing until April 13, 2022, Defendant did not have an adequate detailed written estimate, in current dollars, of the annual cost for post-closure monitoring and maintenance of its Facility.

133.    Defendant has violated the requirements of LAC 33:V.3519, 3527, 2315, 2521, 2719, 2911, and 3207, (40 C.F.R. §§ 264.117 through 264.120, and 40 C.F.R. § 264.288).

134.    Defendant is liable for injunctive relief and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and the La.R.S.30:2025 for each day that it failed to prepare an adequate post-closure cost estimate for each of its hazardous waste units at its Facility.

### Ninth Claim for Relief
*(Failure to Establish Adequate Financial Assurance for Post-Closure of all units that received hazardous waste at the PCS Nitrogen Facility)*

135.    The allegations in Paragraphs 1-134 are re-alleged and incorporated herein by reference.

136.    Pursuant to LAC 33:V.3711, (40 C.F.R. § 264.140(b)), each owner or operator of a hazardous waste management unit is subject to the requirements LAC 33:V.3711, (40 C.F.R. § 264.145) (Financial Assurance for Post-Closure Care).

137.    Pursuant to LAC 33:V.3711, (40 C.F.R. § 264.145), the owner or operator must establish financial assurance for post-closure care in accordance with the approved post-closure plan for its facility sixty (60) days prior to the initial receipt of hazardous waste or the effective date of the regulations, whichever is later.

138.    Since at least February 2004 and continuing at least through the date of the filing of this Complaint, Defendant had not established adequate financial assurance for post-closure care for its hazardous waste units at its Facility.

139.    Defendant has violated the requirements of LAC 33:V.3711, (40 C.F.R.

§ 264.145).

140.    Defendant is liable for injunctive relief and civil penalties pursuant to Section

3008(a) of RCRA, 42 U.S.C. § 6928(a), and La.R.S.30:2025 for each day that it failed to

establish adequate financial assurance for post-closure care for each of its hazardous

waste units at its Facility.

<u>Tenth Claim for Relief</u><br/>
<em>(Failure to Establish Adequate Financial Assurance for Third Party Liability at the PCS<br/>
Nitrogen Facility)</em>

141.    The allegations in Paragraphs 1-140 are re-alleged and incorporated herein by

reference.

142.    Owners and operators of treatment, storage, and disposal facilities are required by

LAC 33:V.3715, (40 C.F.R. § 264.140(a)), to meet the requirements of LAC

33:V.3715.A, (40 C.F.R. § 264.147(a)) (Liability Requirements).

143.    Pursuant to LAC 33:V.3715.A, (40 C.F.R. § 264.147(a)), the owner or operator of

each treatment, storage and disposal facility must demonstrate financial responsibility for

bodily injury and property damage to third parties caused by sudden accidental

occurrences arising from operations of the facility; this liability coverage maybe

demonstrated as specified from the options set forth at, LAC 33:V.3715.A.1 through 6,

(40 C.F.R. § 264.147(a) (1) through (6)).

144.    Owners and operators of surface impoundments, landfills, land treatment

facilities, or hazardous waste disposal miscellaneous units are required by LAC

33:V.3715, (40 C.F.R. § 264.140(a)), to meet the requirements of LAC 33:V.3715.B, (40

C.F.R. § 264.147(b)) (Liability Requirements).

145.    LAC 33:V.3715, (40 C.F.R. § 264.147(b)), requires that the owner or operator of each surface impoundment, landfill, land treatment facility, or hazardous waste disposal miscellaneous unit must demonstrate financial responsibility for bodily injury and property damage to third parties caused by non-sudden accidental occurrences arising from operations of the facility; this liability coverage maybe demonstrated as specified from the options set forth at, LAC 33:V.3715B.1 through 6, (40 C.F.R. § 264.147(b)(1) through (6)).

146.    Pursuant to LAC 33:V.3715.B, (40 C.F.R. § 264.147(b)), owners and operators who are subject to LAC 33:V.3715.B, (40 C.F.R. § 264.147(b)), may combine coverage for sudden and non-sudden accidental occurrences.

147.    Since at least February 2004 and continuing at least through the date of the filing of this Complaint, Defendant had not demonstrated adequate financial responsibility for bodily injury and property damage to third parties for sudden or non-sudden occurrences arising from operations of the facility using any of the options specified in LAC 33:V.3715A.1 through 6 or LAC 33:V.3715B.1 through 6, (40 C.F.R. § 264.147(a)(1) through (6) or (b)(1) through (6)).

148.    Defendant has violated the requirements of LAC. 33:V.3715, (40 C.F.R. § 264.147).

149.    Defendant is liable for injunctive relief and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and the LAC, La.R.S.30:2025 for each day that it failed to establish adequate financial assurance for third party liability at its Facility.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, the United States and the Louisiana Department of Environmental Quality, respectfully request that this Court:

1.      Order the Defendant to immediately comply with the statutory and regulatory requirements cited in this Complaint;

2.      Assess civil penalties against the Defendant for up to the amounts provided pursuant to Sections 3008(a) and 3008(g) of RCRA, 42 U.S.C. §§ 6928(a) and 6928(g); La.R.S. 30:2025 and 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701; and

3.      Grant the United States and the Louisiana Department of Environmental

Quality such other relief as this Court deems just and proper.

FOR THE UNITED STATES:


                               Respectfully Submitted,


                               TODD KIM
                               Assistant Attorney General
                               Environmental Enforcement Section
                               Environment and Natural Resources Division



                               By: /s/ *Deborah M. Reyher*
                               DEBORAH M. REYHER, New York Bar 1953553
                               Senior Counsel
                               Environmental Enforcement Section
                               Environment and Natural Resources Division
                               United States Department of Justice
                               Post Office Box 7611
                               Ben Franklin Station
                               Washington, DC 20044
                               Telephone: (202) 514-4113
                               Fax: (202) 514-0097
                               E-mail: deborah.reyher@usdoj.gov

RONALD C. GATHE, JR.
UNITED STATES ATTORNEY


By: /s/ Davis Rhorer Jr.
Davis Rhorer Jr., LBN 37519
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
E-mail: davis.rhorer@usdoj.gov




OF COUNSEL:

MARCIA ELAZABETH MONCRIEFFE
Texas Bar 00797101
Assistant Regional Counsel
Office of the Regional Counsel
Mail Code 6RC-ER
United States Environmental Protection Agency
Region 6
1201 Elm Street, Suite 500
Dallas, Texas 75270
E-mail: moncrieffe.marcia@epa.gov

LAURA WELLES
Maine Bar 009661
Attorney-Advisor
Office of Civil Enforcement
Mail Code 2249A
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
E-mail: welles.laura@epa.gov

FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY:

OSCAR MAGEE, Trial Attorney (#32302)
AMBER LITCHFIELD, Attorney Supervisor
(#33866)
Office of the Secretary
Legal Affairs Division
Louisiana Dept. of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Phone: (225) 219-3985
Fax: (225) 219-4068

36