# ATTACHMENT C: OPERATIONAL REQUIREMENTS DURING PHOSPHOGYPSUM STACK SYSTEM CLOSURE

### I. Phosphogypsum Stack System General Criteria

<u>Phosphogypsum Stack System Performance Standards</u>.  PCS Nitrogen shall ensure that the physical integrity of the Phosphogypsum Stack System and management of Process Wastewater and Leachate protect human health and the environment by complying at a minimum with the design, construction, operation, inspection, closure, treatment, monitoring, and maintenance requirements specified in this Attachment during Phosphogypsum Stack System Closure ("PSS Closure"), in accordance with Attachment D of Appendix 1 of the Consent Decree and the approved Permanent Closure Plan.  PCS Nitrogen shall also meet the appropriate safety standards, maintain inspection logs and develop and maintain plans to respond to emergency conditions.

### II. Evaluation, Modification and Inspections of the Perimeter Dike

(1) <u>Site investigation</u>.  The Perimeter Dike shall be evaluated, and modified as needed, as part of Phosphogypsum Stack System Closure.  For this modification and any subsequent future modifications, the Perimeter Dike shall be evaluated by an Engineer for the purpose of determining any necessary changes to ensure future structural integrity.  Any plans for modifications shall be certified by an Engineer and submitted to EPA/LDEQ for approval.  Areas of uneven natural subsidence, pockets of organic matter, or other unstable soils shall be avoided, unless special provisions are made for their mitigation.

(2) <u>Soil testing</u>.  A program of soil sampling and testing adequate to determine the characteristics of the foundation material that will support the modified Perimeter Dike and of the material to be used for modification of the Perimeter Dike shall be performed as necessary.  Sampling could include borings, test pits, or in-place samples from an associated exposed excavation face.  All borings and/or test pit explorations shall be logged using a recognized engineering soil classification system, with location and depths of all samples recorded on the log.  Tests to determine in-place densities, shear-strength, and permeability for the foundation and embankment soils shall be performed as needed.

(3) <u>Cross section design</u>.

   (a) The crest on the top of the retrofitted Perimeter Dike shall be graded toward the Outside Slope.  If the modified Perimeter Dike exceeds ten (10) feet in height and crest runoff is directed toward the Outside Slope, runoff controls shall be used to protect the Outside Slope against erosion.  Outside Slopes shall be no steeper than three (3.0) horizontal to one (1.0) vertical.  Inside Slopes shall be no steeper than two (2.0) horizontal to one (1.0) vertical.

   (b) Leachate control shall be provided by means of a compacted clay or Geomembrane Liner constructed in accordance with Section II, Paragraph (13)(c)(i)(A), (B) or (D) of Attachment

D, Appendix 1, of the Consent Decree. The cross-section design for the Perimeter Dike will be illustrated in the Permanent Closure Plan.

(4) <u>Design factors of safety and slope stability of the Perimeter Dike</u>.

    (a) <u>Stability analysis</u>. A seepage or flow net analysis shall be made, when applicable, for use in the stability analysis. The stability analysis shall consider the minimum fluid level as well as the Minimum Required Freeboard on the Inside (upstream) Slope of the Perimeter Dike, and possible fluctuations of the tail water level.

    (b) <u>Design safety factors</u>. The design shall include the following minimum safety factors: 1.75 for horizontal shear at base of fill; 1.5 for horizontal shear within the fill due to seepage through the outer face; 1.5 for horizontal shear or circular arc failure through the foundation soils; 1.5 for protection against shear failure of any circular arc in either Inside or Outside Slope. Water pressure distribution shall be included in the analyses.

(5) <u>Inspections</u>.

    (a) Continuing through at least the first five (5) years after approval of the Permanent Closure Plan, the Perimeter Dike, Lower Perimeter Ditch, and all water control structures shall be inspected daily by a Qualified Company Employee or contractor employed or retained by PCS Nitrogen, unless physical conditions at the Facility pose a danger to human health or welfare in conducting such an inspection, in which case the conditions preventing inspection shall be documented in the log. Daily inspections shall resume as soon as such conditions abate. PCS Nitrogen at any time may request approval from LDEQ for a reduced inspection schedule based on site conditions during the period of Stack Closure. If such a request is made within the first five (5) years following approval of the Permanent Closure Plan, LDEQ's decision shall not be subject to Dispute Resolution or judicial review. After five (5) years, such requests shall be subject to Dispute Resolution but not judicial review. Inspections shall be documented in the log.

    (b) Inspections shall document in the log locations and approximate rate of flow of Leachate (to the extent measurable) into the Lower Perimeter Ditch and any Leachate flow not reporting to the Water Treatment Plant.

    (c) The log shall also document evidence of new or increased visible flow of Leachate into the Lower Perimeter Ditch and steps taken to address such releases to the Lower Perimeter Ditch.

    (d) Water level elevations and Freeboard compliance shall be evaluated at least every twenty-four (24) hours.

    (e) The outside Toe of the Perimeter Dike shall be inspected at least monthly, until the Perimeter Dike has undergone permanent closure, to ensure the area is free of trees, shrubs or other woody plant growth whose roots may induce Piping and compromise integrity of the

Perimeter Dike.  Once the Perimeter Dike is closed pursuant to the requirements of Attachment D of Appendix 1 of the Consent Decree, and in accordance with the approved Permanent Closure Plan, the outside Toe of the Perimeter Dike shall be inspected in accordance with such requirements and schedule.

(f) The Perimeter Dike shall be inspected annually by a Third-Party Engineer with experience in the field of construction and operation of Perimeter Dikes.  An annual report pertaining to such an inspection shall be prepared and shall include any recommendations and corrective measures taken.  The annual inspections shall include:

(i) Analyses of significant items shown on all aerial photographs of the Perimeter Dike that have been taken for any reason since the date of the last annual inspection;

(ii) Condition of soil surfaces and top and slopes of the Perimeter Dike and in areas within fifty feet (50') downstream from the outside Toe;

(iii) Review of all periodic inspection reports to evaluate the effectiveness of maintenance done to the Perimeter Dike during the period since the last annual inspection;

(iv) Examination and interpretation of data obtained from any instrumentation installed in the mass of the Perimeter Dike;

(v) Condition of spillway and water level control structures, including all conduits exiting the Perimeter Dike; and

(vi) All inspections and findings shall be recorded in the log.

(6) <u>Vegetative cover</u>.  An adequate vegetative cover to inhibit wind and water erosion shall be established and maintained on the Outside Slope of the Perimeter Dike.  Such vegetation shall be maintained sufficiently low to permit visual inspection of the soil surfaces and critical areas.

(7) <u>Site preparation</u>.  In accordance with specifications provided by the Engineer, ground that will become the foundation of the modified Perimeter Dike shall be stripped of vegetation and organic detritus or residue, including muck, mud, slimes, or other material which would flow or undergo excessive consolidation under heavy loading.  All earth foundation surfaces on which fill is to be placed shall be scarified or moistened (if needed) and compacted prior to spreading of the first course of fill material, and the modified Perimeter Dike base shall be well drained during construction.

(8) <u>Material to be used</u>.  Material used for the modified Perimeter Dike for the closed Phosphogypsum Stack System shall be free of extraneous matter that could affect the compactability, density, permeability, or shear strength of the finished modified Perimeter Dike (e.g., stumps, vegetation, trees, palmettos, debris).

(9) Methods of construction.

    (a) Modifications to the Perimeter Dike shall be constructed to meet or exceed the minimum safety requirements of Paragraph (4)(b) of this Section, and the specifications and design for the Perimeter Dike. Appropriate earthmoving equipment shall be used to place materials during Perimeter Dike modification. The soil shall be compacted, and density tests shall be performed to ensure that the specified densities are obtained. A representative of the Third-Party Engineer shall be present on the site during modification of the Perimeter Dike and/or Liner, and during construction and installation of spillways associated with the Perimeter Dike or Liner. LDEQ and EPA shall be advised of the date on which modification of the Perimeter Dike will begin.

    (b) Areas around any water level control pipe, any other conduit, or any surface of discontinuity between materials within the mass of the Perimeter Dike shall be carefully inspected to avoid potential leaks and to ensure that soils under and around a culvert are uniformly compacted and are in continuous contact with the external culvert surface. All penetrations through the Liner on the Inside Slope of the Perimeter Dike shall be made using water-tight joints or connections and shall be capable of maintaining their integrity under anticipated in-use conditions. To avoid leaks associated with differential settlement, pipes through the Perimeter Dike shall not be rigidly supported by piles or piers. Backfill around pipes shall be of a density that is equal to or greater than the density of the surrounding embankment. Particular attention shall be devoted to the lower third of the pipe.

    (c) Modification to the Perimeter Dike during the PSS Closure shall meet at a minimum the applicable provision in the Closure Construction Quality Assurance Plan of the Consent Decree (*see* Appendix 1, Attachment D, Section II, Paragraph (14) of the Consent Decree).

**III. Site-Wide Water and Wastewater Management**

(1) Groundwater monitoring. The Facility shall perform groundwater monitoring and reporting as prescribed in Paragraph 17 of the Consent Decree.

(2) Surface water management. The Phosphogypsum Stack System shall be operated to provide for the collection, control, and/or treatment prior to discharge of surface runoff from the Phosphogypsum Stack System to meet the effluent limitations for wastewater specified at 40 C.F.R. §§ 418.12 and 418.13, and LAC 33:IX.1113.C.1.

(3) Leachate management. Leachate from the Phosphogypsum Stack System (Active and Inactive Components) shall be contained within the Phosphogypsum Stack System and 1st Stage LSSI in accordance with the Permanent Closure Plan and treated prior to discharge to meet the effluent limitations for wastewater specified at 40 C.F.R. §§ 418.12 and 418.13, and LAC 33:IX.1113.C.1, except as described in Section IV, Paragraph (1)(a) and (b), below. Leachate management shall comply with the requirements of Appendix 1, Attachment D, Section II, Paragraphs (12)-(13) and (16) of this Consent Decree.

(4) <u>Leachate mixed with stormwater</u>.  Stormwater or other water that mixes with Leachate in a Phosphogypsum Stack System impoundment or in the Toe Drain shall be considered Leachate. Leachate and any mixture of Leachate, stormwater and/or other waters shall be managed pursuant to Paragraph (3) above.

(5) Paragraphs (3) and (4), above, shall become effective thirty (30) Days following the later of: (a) issuance of the pending Louisiana Pollutant Discharge Elimination System ("LPDES") permit, including an effective authorization to discharge treated water; (b) initiation of second-stage treatment of wastewater in accordance with Appendix 3 to the Consent Decree; and (c) LDEQ approval of completion of construction of the Inactive Toe Drain Tie-In Project pursuant to Section III, Paragraph 8 of this Attachment.

(6) Paragraph (2), above, shall become effective thirty (30) Days following the later of: (a) completion of the milestones in Paragraph (5) above; and (b) completion of first-stage treatment of ponded water in the Phosphogypsum Stack 11 impoundment in accordance with the schedule in the Permanent Closure Plan (Appendix 2, Attachment B of the Consent Decree).

(7) <u>Seepage</u>.  Seepage from Inactive Phosphogypsum Stacks that is collected with stormwater in the lined Lower Perimeter Ditch is not considered Leachate and may continue to be managed with materials in the Lower Perimeter Ditch in compliance with the LPDES permit, provided that any materials in the Lower Perimeter Ditch, thirty (30) Days following completion of the milestones identified in Paragraph 6, above, meet the effluent limitations for wastewater specified at 40 C.F.R. §§ 418.12 and 418.13, and LAC 33:IX.1113.C.1.

> (a) Continuing through at least the first five (5) years after approval of the Permanent Closure Plan, unless conditions at the Facility pose a danger to human health or welfare in conducting an inspection, PCS Nitrogen shall inspect the Lower Perimeter Ditch daily and the side slopes monthly to locate and estimate the amount of any visible flow of Leachate and shall take all necessary steps to prevent and minimize the entry of Seepage or Leachate into the Lower Perimeter Ditch.  If physical conditions at the Facility pose a danger to human health or welfare in conducting such an inspection, the conditions preventing inspection shall be documented in the log.  Daily inspections shall resume as soon as such conditions abate. PCS Nitrogen may request approval from LDEQ at any time for a reduced inspection schedule based on site conditions during the period of Stack Closure.  If such a request is made within the first five (5) years following approval of the Permanent Closure Plan, LDEQ's decision shall not be subject to Dispute Resolution or judicial review.  After five years, such requests shall be subject to Dispute Resolution but not judicial review.
>
> (b) A steady and visible stream of Leachate into the Lower Perimeter Ditch is not Seepage and must be investigated as a potential critical condition in accordance with Appendix 1, Attachment E (Critical Conditions and Temporary Measures) of the Consent Decree, and managed pursuant to Paragraphs (3) and (4) above.  PCS Nitrogen shall document the inspections and any follow-up repairs or mitigation measures in the log.

(8) <u>Inactive Toe Drain Tie-In Project</u>.  PCS Nitrogen shall implement a Toe Drain tie-in project segregating Leachate from stormwater runoff associated with the Inactive Phosphogypsum

Stacks in accordance with the following schedule, to the extent such milestones have not already been completed:

(a) PCS Nitrogen has submitted to LDEQ for approval a solid waste minor permit modification application, including the design and engineering plan describing the work and schedule necessary for completion of the Toe Drain tie-in project;

(b) Within thirty (30) Days of LDEQ's issuance of the final solid waste permit necessary for construction of the Toe Drain tie-in project, PCS Nitrogen shall initiate field construction for the Toe Drain tie-in project;

(c) Within one hundred fifty (150) Days of initiation of field construction, PCS Nitrogen shall complete construction of the Toe Drain tie-in project; and

(d) Within sixty (60) Days of completion of the Toe Drain tie-in project, PCS Nitrogen shall provide LDEQ with a third-party certification of completion.

(9) Freeboard.

(a) Except as provided below in this Sub-Paragraph, the Minimum Required Freeboard of any impoundment that stores or transports Process Wastewater, Leachate, or stormwater that has contacted Phosphogypsum or Process Wastewater, associated with a Phosphogypsum Stack System shall not be less than five (5) feet unless a Minimum Required Freeboard of less than five (5) feet has been accepted by EPA and/or LDEQ based on Wind Setup and Wave Run-up analyses incorporating the evaluations described in (b), below. However, in no event shall the Minimum Required Freeboard of such an impoundment be less than three (3) feet.

(i) With respect to the Active Clearwell, Inactive Clearwell, Lower Perimeter Ditch, and Stack 11 (each of which is depicted on Appendix 1, Attachment B of the Consent Decree), LDEQ has accepted a Minimum Required Freeboard of not less than three (3) feet, although this acceptance may be amended or revoked based on the results of future engineering analyses.

(ii) With respect to the Lower Perimeter Ditch, the three (3) foot Minimum Required Freeboard set forth in Paragraph 9(a)(i), above, shall not become effective until the Earthen Perimeter Dike is raised in accordance with the schedule set forth in the Permanent Closure Plan. After completion of the conversion and certification of the Lower Perimeter Ditch for use as a freshwater pond in accordance with the Permanent Closure Plan, freeboard in the Lower Perimeter Ditch may be maintained at the locally appropriate level for stormwater impoundments instead of the mandatory three (3) feet minimum.

(b) Minimum Required Freeboard shall be determined by generally accepted good engineering practices and shall include, at a minimum, evaluation of Wind Setup, Wave

Height, and Wave Run-up analysis, erosion protection measures and protection of the Dike integrity and inner rim ditch geometry.  All impoundments associated with a Phosphogypsum Stack System shall be operated so as to maintain the Minimum Required Freeboard, unless temporary incursions (temporary use) into the Minimum Required Freeboard are demonstrated to be safe in accordance with Paragraph 9(d), below.

(c) Wind speed used in the calculation of Wave Height in (b) above shall be defined as a sustained wind speed for a ten (10)-minute duration.

(d) Temporary use of Minimum Required Freeboard:

  (i) To assure system safety and integrity and/or to reduce the probability of discharge, a Facility seeking to temporarily encroach into the Minimum Required Freeboard of a Perimeter Dike must maintain the safety and stability of the Perimeter Dike.  If PCS Nitrogen seeks temporary use of the Minimum Required Freeboard, it must document a demonstration that safety and stability is maintained throughout use.

  (ii) Such use of the Minimum Required Freeboard shall only be allowed when a Third-Party Engineer has approved such use and when documentation demonstrating the continued safety and stability of the Perimeter Dike is submitted to LDEQ.  Such documentation shall include a listing of any operational limitations or constraints recommended by the Third-Party Engineer as set forth in this Section together with confirmation that PCS Nitrogen shall comply with such recommendations.  The Third-Party Engineer shall base his or her recommendations on:

    (A) An inspection of the Phosphogypsum Stack System;

    (B) Dike design and construction information;

    (C) Results of seepage and stability analyses, consistent with H.R. Cedergren, *Seepage, Drainage and Flow Nets* (1989) (published by John Wiley & Sons, Inc.); GEO-SLOPE International Ltd. (Calgary, Canady), *Seepage Modeling with SEEP/W: An Engineering Methodology* (July 2012) (including monitoring of Pore Water pressure within the Dike if such monitoring is deemed necessary); and

    (D) Wind Setup and Wave Run-up analyses.

  (iii) The report by the Third-Party Engineer shall specify conditions under which such use may be undertaken so as not to jeopardize the integrity of the Dike, such as:

    (A) Acceptable wind speeds in forecast;

    (B) Increased inspection frequencies; and

      (C) Weekly monitoring of piezometric levels within the mass of the Dike, if and as needed.

   (iv) The Third-Party Engineer shall reevaluate the Phosphogypsum Stack System each time use of the Minimum Required Freeboard is proposed by PCS Nitrogen. LDEQ shall be informed of the proposed use and the Engineer's recommendations prior to or within twenty-four (24) hours of each such occurrence.

(10) <u>Site-specific Water Management Plan</u>. As part of the Permanent Closure Plan, PCS Nitrogen has submitted a Site-specific Water Management Plan ("SSWMP"), describing the procedures and activities during PSS Closure relating to the management, Storage, treatment and disposition (e.g., disposal) of the anticipated volume of ponded Process Wastewater, Leachate, stormwater, and runoff from the Phosphogypsum Stack System. The SSWMP shall include, but not be limited to, an estimate of the anticipated ponded water inventory at the beginning of the PSS Closure period, the anticipated PSS Closure sequence, the water balance analysis required by Paragraph (11) below during the PSS Closure period, an estimate of the Leachate due to Phosphogypsum Stack consolidation and drainage during the PSS Closure period, the adequacy of the available surge Storage capacity through the PSS Closure period, a description of any treatment of the Process Wastewater, Leachate and runoff (including neutralization or use of a wastewater treatment facility, if applicable), and the final disposition of ponded Process Wastewater, Leachate and runoff. An independent Third-Party Engineer with Water Management (including water balance) and treatment expertise must be used to evaluate and prepare the SSWMP. An annual update to the SSWMP shall be submitted on February 1 of each year.

(11) <u>Water Balance Analysis</u>. A water balance shall be updated annually and submitted on February 1 as part of the SSWMP during the PSS Closure, and in accordance with the requirements below.

   (a) To account for the water accumulation season in Louisiana, noted as winter due to high rainfall and low evaporation rates, the water balance analysis shall use December 1 as the beginning date for the analysis, unless EPA and LDEQ approve the use of an alternate date where a larger volume of precipitation or water accumulation is expected. The analysis shall identify the rates of all water inputs and outputs, any manufacturing production changes, and changes in Process Watershed area considered in the analysis. A Third-Party Engineer shall verify the accuracy of the analysis.

   (b) The water balance calculations shall be performed for five (5) distinct extreme rainfall scenarios applied for the subsequent five (5)-year period using monthly, or more frequent, input rainfall quantities which shall include (i) and (ii) below.

      (i) Rainfall corresponding to the highest monthly 100-year Rainfall Event occurring during the annual 100-year Rainfall Event, as defined in Attachment F (Definitions for Attachments to the Consent Decree), of Appendix 1 of the Consent Decree; and

(ii) Annual rainfall events shall be determined based on a long-term rainfall record from a National Oceanic and Atmospheric Administration ("NOAA") weather station with long-term data availability in the vicinity of the Facility. Alternatively, PCS Nitrogen may use the NOAA point precipitation frequency website to determine these rainfall events. The five (5)-year rainfall total shall be based on a cumulative five (5)-year rainfall event which has a probability of exceedance of five percent (5%), which shall be considered an equivalent probability as the 100-year Rainfall Event (i.e., a probability of not being exceeded = 99%) for not being exceeded during a five (5)-year period (i.e., $[1 – 0.99^5]$ = 5%).

Example of the input annual rainfall quantities for each of the five (5)-year extreme rainfall scenarios:

|  | Rainfall, inches | | | | | |
|---|---|---|---|---|---|---|
|  | Year 1 (Y1) | Year 2 (Y2) | Year 3 (Y3) | Year 4 (Y4) | Year 5 (Y5) | Total ($\Sigma$) |
| Scenario 1 | 100-year annual rainfall quantity incorporating the highest monthly 100-year Rainfall Event (Y1) | An annual rainfall event which together with the preceding or following annual rainfall event, contributes to a 2-year total which has a 5% probability of exceedance (Y2) | An annual rainfall event which together with the preceding or following annual rainfall events, contributes to a 3-year total which has a 5% probability of exceedance (Y3) | An annual rainfall event which together with the preceding or following annual rainfall events, contributes to a 4-year total which has a 5% probability of exceedance (Y4) | An annual rainfall event contributing to a 5-year total which has a 5% probability of exceedance (Y5) | 5-year cumulative rainfall total determined in accordance with (11)(b)(ii) of this Section ($\Sigma$) |
| Scenario 2 | (Y3) | (Y1) | (Y2) | (Y5) | (Y4) | ($\Sigma$) |
| Scenario 3 | (Y5) | (Y4) | (Y1) | (Y3) | (Y2) | ($\Sigma$) |
| Scenario 4 | (Y2) | (Y3) | (Y4) | (Y1) | (Y5) | ($\Sigma$) |
| Scenario 5 | (Y4) | (Y5) | (Y3) | (Y2) | (Y1) | ($\Sigma$) |

(iii) The rainfall quantities exceeding or less than the long-term average annual rainfall shall be distributed at least amongst the various months of the year, other than the month for the highest monthly 100-year Rainfall Event, in proportion to the normal monthly rainfall amounts determined from the corresponding long-term record.

(c) The water balance analysis for any Phosphogypsum Stack System shall indicate whether the system Storage will be insufficient to meet any of the following water balance targets:

(i) At the beginning of the water accumulation season in Louisiana (November 1) the calculated 100-year, 24-hour rainfall event plus one-half the value for the 25-year, 24-hour rainfall event calculated (in inches) for the area where the Facility is located.

> (ii) At the end of the water accumulation season in Louisiana (March 31), the 100-year, 24-hour rainfall calculated (in inches) for the area where the Facility is located.
>
> (iii) Water levels that encroach into the Minimum Required Freeboard for any impoundment at any time during a year. If the water balance for any Phosphogypsum Stack System indicates that system Storage is less than the water balance targets in (i) or (ii) above, the owner/operator must provide reasonable assurance that additional Process Wastewater and Leachate consumption or management items, not already included as outputs in the water balance analysis, are readily available and capable of achieving these water balance targets.

(d) If the water balance indicates that, at any time during the five (5)-year modeling period, Process Wastewater and Leachate levels, in conjunction with additional available Process Wastewater and Leachate consumption or management items, will not meet the water balance targets, then the owner/operator must provide additional Process Wastewater and Leachate consumption or management items and submit an alternatives plan and implementation schedule for approval by LDEQ and/or EPA for the additional consumption or management measures within ninety (90) Days of submittal of the water balance analysis. The plan and schedule shall include, at a minimum, the following elements:

> (i) A listing and description of the additional Process Wastewater and Leachate consumption or management items to be evaluated, including the identification of items that can be rapidly implemented to achieve the water balance targets;
>
> (ii) A listing of interim measures that can be implemented to prevent an unpermitted release of Process Wastewater or Leachate in the event that actual rainfall events contribute to Process Wastewater and Leachate levels encroaching into the Minimum Required Freeboard; and
>
> (iii) A proposed schedule for the evaluation, selection, engineering, design, and construction, installation or implementation for the items and interim measures needed to increase water consumption, reduce inventories, or any combination of such actions that will result in achievement of the water balance targets.

**IV. Prohibition in Management of Process Wastewater and Leachate**

(1) Storage and containment of Process Wastewater and Leachate outside the footprint of the Phosphogypsum Stack System is prohibited except:

> (a) When the Process Wastewater and/or Leachate is being transferred from the Phosphogypsum Stack System through a piping system for treatment at the Water Treatment Plant, including to/from a lime treatment pond, or
>
> (b) As provided in Section IV of Appendix 1, Attachment E (Critical Conditions and Temporary Measures) of the Consent Decree.

(2) The footprint of the Phosphogypsum Stack System, for purposes of this Paragraph is defined as the outside edge of the dams, Dikes, or ditches used to store or contain Process Wastewater and/or Leachate (*see* Appendix 1, Attachment B of the Consent Decree for illustration).

**V. Contingency Plan**

(1) The Contingency Plan shall be submitted for review to EPA and/or LDEQ within sixty (60) Days of the lodging of the Consent Decree. Once approved by EPA and/or LDEQ, PCS Nitrogen shall maintain a copy at the Facility, provide a copy to any contractors and consultants implementing the approved Permanent Closure Plan, and to all local police departments, fire departments and local emergency response teams that may be called upon to provide emergency services.

(2) The Contingency Plan shall be designed to minimize hazards to human health and the environment from fires, explosions, hurricanes or unplanned sudden or non-sudden release of Phosphogypsum, Process Wastewater, Leachate, sludge or contaminated runoff to air, soil, or surface waters outside the footprint of the Phosphogypsum Stack System or 1st Stage LSSI. Implementation of the Contingency Plan shall be immediate whenever there is a fire, explosion, significant weather event (e.g., hurricane, tornado, major precipitation event), non-site event (e.g., flooding, neighboring plant disaster), or release that could threaten human health or the environment.

    (a) The elements of the Contingency Plan shall address the applicable elements of the "National Response Team's Integrated Contingency Plan Guidance," 61 Fed. Reg. 28,642 (June 5, 1996), as updated, and demonstrate the ability to mobilize equipment and manpower to respond to emergency situations (e.g., fires, explosions hurricanes or unplanned sudden or non-sudden release of Phosphogypsum, Process Wastewater, Leachate, sludge, or contaminated runoff to air, soil or surface water outside the footprint of the Phosphogypsum Stack System or 1st Stage LSSI).

    (b) The Contingency Plan shall include annual training of the appropriate personnel in inspection and operation of the Phosphogypsum Stack System under the Permanent Closure Plan, and the Contingency Plan requirements. Newly hired personnel shall receive training prior to engaging in inspection or other related Permanent Closure Plan activities. A training plan consistent with the requirements of the Contingency Plan and the Permanent Closure Plan shall be maintained at the Facility. Records demonstrating that appropriate personnel have received the necessary training shall be maintained in a log or similar record (e.g., training sign in sheet, etc.). Any employee that has supervisor or authority above shall have reviewed the historical engineering documentation related to the operation and maintenance of the Phosphogypsum Stack System and the Permanent Closure Plan. If an essential employee leaves the work area and employment, a trained replacement person shall replace the person that left as soon as possible, to ensure that the work area is never understaffed.

(3) The Contingency Plan shall include an emergency plan to prevent Dike failure that includes:

(a) Sand bag placement;

(b) Trac hoes or similar equipment stationed on-site;

(c) Temporary soil placement;

(d) Rip-rap placement;

(e) Wastewater and water management;

(f) Reconstruction and repairs;

(g) Monitoring and reporting of each incident; and

(h) Submission of initial report that includes a schedule for repair, extent of impact report, and clean-up measures taken and completed.

**VI. Repurposed Component During PSS Closure**

(1) To facilitate PSS Closure an existing lined Component of the Phosphogypsum Stack System may be repurposed to store Process Wastewater, Leachate, or a lime treatment sludge. The following existing Components are the only Components of the Phosphogypsum Stack System that may be repurposed during PSS Closure: (a) lined Active Clearwell, (b) lined Inactive Clearwell, (c) a lined Surge Pond; (d) a Stack 11 impoundment; and (e) Lower Perimeter Ditch.

(2) PCS Nitrogen shall submit the following information when requesting approval to repurpose an existing lined Component in the Permanent Closure Plan or in accordance with Section II, Paragraph (3)(b)(i) of Attachment D, of Appendix 1 of the Consent Decree (i.e., modification of approved Permanent Closure Plan):

(a) Information substantiating that the design, construction and operation of the repurposed lined Component is sufficient to protect human health and the environment.

(b) Information substantiating that the design, construction and operation of the repurposed lined Component is sufficient to manage and store the waste materials (i.e., Process Wastewater, Leachate or lime treatment sludge) to be placed in the repurposed lined Component.

(c) Information substantiating that the operation of the repurposed lined Component meets the requirements of this Attachment and Attachment D, of Appendix 1 of the Consent Decree.

(3) PCS Nitrogen shall not repurpose the requested lined Component until approved by EPA and/or LDEQ.

(4) Closure of the repurposed lined Component shall be in accordance with Appendix 1, Attachment D of the Consent Decree, and the approved Permanent Closure Plan.