<u>APPENDIX 2:  FINANCIAL ASSURANCE</u>

This Appendix sets forth the obligations of PCS Nitrogen to secure and maintain Financial Assurance, as required under Paragraph 19 of the Consent Decree, including schedules and notice requirements (and, as stated in Paragraph 19.b of the Consent Decree, Financial Assurance under this Appendix shall be deemed to fully satisfy PCS Nitrogen's obligation to comply with LAC 33:V. Chapter 37, and LAC 33:VII.1303, 1307 and 1399, including the reporting requirements thereof, with respect to financial assurance for Closure and Post-Closure Care for the Phosphogypsum Stack System at the Facility and Third-Party liability coverage).  Submittals requiring EPA approval shall be submitted pursuant to Section V (Compliance), Paragraphs 20 and 21, and Section XIV (Notices) of the Consent Decree.  "EPA approval" or "determination" as used in this Appendix means an approval or determination by EPA in consultation with LDEQ, or by LDEQ if EPA delegates such authority to LDEQ pursuant to Paragraph 4 of the Consent Decree with notice to PCS Nitrogen.  An EPA approval or determination shall be subject to dispute resolution pursuant to Section X (Dispute Resolution) of the Consent Decree, including judicial review, unless this Appendix specifies otherwise.  The standard of review regarding any EPA approval or determination under this Appendix (including requirements incorporated by reference) shall be governed by Paragraph 62 of the Consent Decree.  If, in situations where judicial review is not precluded by this Appendix, PCS Nitrogen seeks but does not prevail on judicial review of such EPA approval or determination, PCS Nitrogen shall pay all costs incurred by the United States and LDEQ in connection with such judicial review, including attorneys' fees.

Any modification of a time period specified by this Appendix or its Attachments is a non-material modification for purposes of Section XXIV (Appendices), Paragraph 103 of the Consent Decree.

Under this Appendix, when PCS Nitrogen is required to provide an originally-signed certification by the Chief Financial Officer ("CFO"), unless otherwise specified, another designated corporate officer may provide the signed certification if authority to sign has been assigned or delegated in accordance with corporate procedures and bylaws.  PCS Nitrogen shall use the form provided in Attachment A ("CFO Certification") of this Appendix for this certification.

I. <u>Definitions</u>

Except as otherwise provided in this Appendix, definitions for the terms presented herein shall be incorporated from LAC 33:V.3703.[1]  Whenever the terms set forth below are used in this Appendix, the definitions set forth below shall apply.  Other definitions set forth in the Consent Decree also shall apply as relevant.  The Parties are bound by these definitions in connection with any matter relating to enforcement of or dispute under this Consent Decree, but are not bound by them in connection with matters unrelated to this Consent Decree.

---

[1] Louisiana has promulgated financial assurance regulations that have been approved by the EPA as part of Louisiana's authorized hazardous waste program under the Resource Conservation and Recovery Act, 42 U.S.C. § 6926.  *See* LAC 33:V.3701 *et seq.*

1

"Affiliate" shall have the same meaning as set forth in Accounting Standards Codification ("ASC") 850-10-20, Related Party Disclosures (Glossary):  "A party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity."

"Anniversary Date" shall mean the annual anniversary of the date that Financial Assurance is provided unless otherwise stated in this Appendix.  The Anniversary Date for a Self-Assurance Mechanism shall be ninety (90) Days after the end of PCS Nitrogen's fiscal year.

"Assets" shall mean all existing and all probable future economic benefits obtained or controlled by a particular entity, as a result of past transactions or events, as represented on the company's Independently Audited balance sheet.

"Assets located within the United States" shall mean the sum of all Assets located in the United States.

"Certified Public Accountant" or "CPA" shall mean an accountant who has demonstrated the requisite certification requirements of the American Institute of Certified Public Accountants ("AICPA") and met all statutory and licensing requirements of the state in which (s)he works.

"Chief Financial Officer" or "CFO" shall mean the corporate official or senior executive that has the responsibility to manage the finances of PCS Nitrogen.

"Control" shall have the same meaning as set forth in the ASC 850-10-20, Related Party Disclosures (Glossary):  "The possession, direct or indirect, of the power to direct or cause the direction of management and policies of an entity through ownership, by contract, or otherwise."

"Cost Estimate" shall mean the estimate of the costs for Stack System Closure and Long-Term Care at the Facility as set forth in Section II of this Appendix.

"Current Assets" or "CA" shall mean cash or other assets or resources commonly identified as those that are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business, as represented on the company's Independently Audited balance sheet.

"Current Dollars" shall mean U.S. dollars in the year actually received or paid, unadjusted for price changes or inflation.

"Current Liabilities" or "CL" shall mean obligations whose liquidation is reasonably expected to require the use of existing resources classifiable as Current Assets or the creation of other current liabilities, as represented on the company's Independently Audited balance sheet.

"Current Ratio" shall mean Current Assets divided by Current Liabilities ("CA/CL").

"Debt-to-Equity Ratio" shall mean the total Liabilities divided by Net Worth ("TL/NW").

"Environmental Obligations" shall mean obligations that are assured through the use of a financial test and/or guarantee both in programs that EPA directly operates and in programs where EPA has delegated authority to the state or approved a state's program.  These obligations include, but are not limited to:  liability, closure, post-closure and corrective action cost estimates for hazardous waste treatment, storage, and disposal facilities pursuant to 40 C.F.R. §§ 264.101, 264.142, 264.144, 264.147, 265.142, 265.144 and 265.147; cost estimates for municipal solid waste management facilities pursuant to 40 C.F.R. §§ 258.71, 258.72 and 258.73; cost estimates for industrial or commercial waste facilities; current plugging and abandonment cost estimates for underground injection control facilities pursuant to 40 C.F.R. § 144.62; cost estimates for petroleum underground storage tanks pursuant to 40 C.F.R. § 280.93; cost estimates for PCB facilities pursuant to 40 C.F.R. § 761.65; any financial assurance required under, or as part of an action under, the Comprehensive Environmental Response, Compensation, and Liability Act; and any other environmental obligation assured through a financial test and/or guarantee.

"Exchange" shall mean a place where securities are traded (e.g., New York Stock Exchange).

"Financial Mechanism" shall mean those mechanisms or instruments specified in this Appendix used to secure funding for an obligation under the Consent Decree.

"GAAP" shall mean U.S. Generally Accepted Accounting Principles.

"Guarantee" or "Corporate Guarantee" shall mean an agreement in which a second entity assumes responsibility for providing the resources to perform (e.g., provide alternate Financial Assurance) and/or the performance of an obligation if the entity primarily liable fails to perform as set forth in this Appendix 2.  The entity providing the Guarantee is the Guarantor.

"Immediate Family" shall have the same meaning as set forth in the ASC 850-10-20, Related Party Disclosures (Glossary):  "Family members who might control or influence a principal owner or member of management or who might be controlled or influenced by a principal owner or a member of management, because of a family relationship."

"Independent Attorney" shall mean an attorney hired by PCS Nitrogen to provide the opinion required by Paragraph 10.f. of this Appendix.  The Independent Attorney must be licensed and in good standing, have expertise in the areas of law for which the opinion is being rendered, free of control by PCS Nitrogen (or PCS Nitrogen's Guarantor or Related Party), and able to exercise his or her judgment as to the required opinion.  PCS Nitrogen shall waive any claim of attorney-client privilege or work-product doctrine in connection with the Independent Attorney's provision of the opinion required by Paragraph 10.f., and shall provide EPA with any requested support for the Independent Attorney's opinion.

"Independent Audit" or "Independently Audited" shall mean an independent assessment (audit) of the fairness by which a company's financial statements are presented by its management in conformance with GAAP.  The audit must be performed by an independent Certified Public Accountant and conform to U.S. Generally Accepted Auditing Standards ("GAAS").  An Independently Audited financial statement is a financial statement that has been subject to such an Independent Audit.

3

"Intangible Assets" or "IA" shall mean assets that lack physical substance, as defined under GAAP and as accounted for in the company's Independently Audited financial statements, including, but not limited, to patents, copyrights, franchises, goodwill, trademarks, and trade names.

"Investment Grade" shall mean a Long-Term Issuer Credit Rating of BBB, or long-term Corporate Family Rating of Baa2, or equivalent or above, assigned by a Nationally Recognized Statistical Rating Organization ("NRSRO").

"Liabilities" shall mean all probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events, as represented on the company's Independently Audited balance sheet.

"Long-Term Care" shall have the same meaning as set forth in Appendix 1, Attachment F, for those activities required pursuant to Appendix 1, Attachment D, and for purposes of Appendix 2, shall:  (1) include associated Water Management activities, and (2) be substituted for the term "post-closure" in LAC 33:V. Chapter 37.

"Management" shall have the same meaning as set forth in the ASC 850-10-20, Related Party Disclosures (Glossary):  "Persons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which those objectives are to be pursued.  Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice president in charge of the principal business functions (such as sales, administration, or finance), and other persons who perform similar policymaking functions.  Persons without formal titles also may be members of management."

"Net Present Value" or "NPV" shall mean the total present value of a time series of cash flows.

"Net Worth" shall mean total Assets minus total Liabilities and is equivalent to shareholder's (or owner's) equity, as represented on the company's Independently Audited balance sheet.

"Non-U.S. Corporation" shall mean a legal entity, chartered by a state or government outside the continental United States, Alaska, Hawaii, or U.S. territories.

"Operating Cash Flow" shall mean the net cash provided by operating activities, as determined on a consolidated basis, as accounted for pursuant to GAAP, and as represented on a company's Independently Audited consolidated statements of cash flows (also referred to as "cash flows provided by operations" or "cash flow from operating activities").

"Principal Owners" shall have the same meaning as set forth in the ASC 850-10-20, Related Party Disclosures (Glossary):  "Owners of record or known beneficial owners of more than 10 percent of the voting interests of the entity."

"Related Party" or "Related Parties" shall have the same meaning as set forth in the ASC 850-10-20, Related Party Disclosures (Glossary):  "Related parties include:  affiliates of the entity; entities for which investments in their equity securities would be required, absent the election of

the fair value option under the Fair Value Option Subsection of Section 825-10-15, to be accounted for by the equity method by the investing entity; trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; principal owners of the entity and members of their immediate families; management of the entity and members of their immediate families; other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; and other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests."

"Self-Assurance Mechanism" shall mean a corporate financial test or a Corporate Guarantee as set forth in this Appendix.

"Stack Closure" or "Stack System Closure" shall have the same meaning as "Stack Closure" in Attachment F, Appendix 1, for those activities required pursuant to Attachment D, Appendix 1, and, for purposes of Appendix 2, shall:  (1) include associated Water Management activities, and (2) be substituted for the term "closure" in LAC 33:V. Chapter 37.

"Substantial Business Relationship" shall mean the extent of a business relationship necessary under applicable state law to make a guarantee contract issued incident to that relationship valid and enforceable.  A "Substantial Business Relationship" must arise from a pattern of recent or ongoing business transactions, in addition to the guarantee itself, such that a currently existing business relationship between the guarantor and the owner or operator is demonstrated to the satisfaction of EPA.

"Tangible Assets" shall mean total Assets minus Intangible Assets.

"Tangible Assets located within the United States" shall mean the sum of all Tangible Assets located in the United States.

"Tangible Net Worth" or "TNW" shall mean total Assets minus Intangible Assets and minus total Liabilities ("(TA-IA)-TL").

"Third-Party" or "Third Party" shall mean a party that is not a Related Party or a party with a Substantial Business Relationship to PCS Nitrogen.

"Third-Party Mechanism" shall mean a trust fund, surety bond, letter of credit, or insurance as set forth in this Appendix.

"Trust Agreement" shall mean a signed document that establishes a trust fund.  A trust fund is a mechanism in which legal title to property (e.g., cash, investment securities) is transferred from PCS Nitrogen (the "Grantor") to another party (the "Trustee") who will hold and administer the property for the benefit of EPA and LDEQ (the "Beneficiaries").

II. Cost Estimate

1.      PCS Nitrogen has provided, and EPA has accepted, its Cost Estimate meeting the requirements of this Section, which is set forth in Tables 3.1 through 3.5 of Appendix 2, Attachment B.

        a.      The Cost Estimate shall include a detailed written Cost Estimate for Stack System Closure and Long-Term Care for the Facility, including but not limited to the cost of cover material, topsoil, seeding, fertilizing, mulching, labor, land surface care, wastewater treatment, and any other costs of compliance with Appendix 1, Attachment D.  The Cost Estimate shall be calculated based on the point in time when the manner and extent of Stack System Closure and Long-Term Care is the most expensive.  The Cost Estimate submitted under Paragraph 1, above, and all subsequent updates, shall be based on what it would cost to hire a Third Party to complete Stack System Closure and Long-Term Care in that year, except as provided in Paragraph 1.b., below.

        b.      Subject to PCS Nitrogen meeting the conditions set forth in this Paragraph 1.b., including access in Paragraph 1.b.(1), PCS Nitrogen may provide a Cost Estimate that includes a cost for soil from a borrow area at the Facility, in lieu of the cost to obtain soil from a Third Party. PCS shall provide information in the Cost Estimate describing the soil borrow areas (e.g., acreage, location, soil quantity available, quality of borrow soil).

        (1)  PCS Nitrogen agrees that, if a takeover of Work occurs pursuant to Section VI of the Consent Decree, the United States and LDEQ (including a receiver designated pursuant to Section VI (Work Take-over) of the Consent Decree, or trustee directing Stack System Closure and/or Long-Term Care), in addition to their right to Financial Assurance as set forth in the Consent Decree, shall have the same legal right of access to and use of such soil, and any equipment necessary to access and process such soil, as PCS Nitrogen would have.  PCS Nitrogen shall confirm with its updated Cost Estimate submittal required under Paragraph 4, below, that the United States and LDEQ continue to have a right to access and use the soil, that the soil available in quantity and quality is sufficient for Phosphogypsum Stack System Closure, and that PCS Nitrogen knows of no reasons as to why the United States and LDEQ, or their representatives, could not have access to and use of the borrow area(s) and soil.

        (2)  If PCS Nitrogen or EPA determines that such access cannot be had, or that the available soil in the borrow area is insufficient in quantity and/or quality for Phosphogypsum Stack System Closure, then PCS Nitrogen in its next annual Cost Estimate shall submit to EPA an updated Cost Estimate recalculating the soil cost for that quantity of soil not available in the designated borrow area:  (i) based on the cost of soil from a substitute borrow area at the Facility; (ii) based on the cost of soil and transportation from a substitute borrow area in the vicinity of the Facility on property owned by PCS Nitrogen; or (iii) if such substitute borrow area is not available, the cost to obtain soil from a Third Party.  PCS Nitrogen shall provide any additional or alternative Financial Assurance necessary to cover this cost in the next annual Financial Assurance submittal following submittal of the revised Cost Estimate as established in this Paragraph 1.b.(2).

(3)  Nothing in this Paragraph 1.b. shall be construed as transferring to the United States, LDEQ or their representatives any obligation that PCS Nitrogen may have under the law, including permit requirements, to properly manage, close and/or remediate the soil borrow areas, or otherwise creating such obligations for the United States and/or LDEQ, or their duly designated representatives.

2.      The Cost Estimate shall:

        a.      Be calculated in Current Dollars if PCS Nitrogen provides Financial Assurance under Section III.A (Type A Financial Assurance), below; or

        b.      Be calculated in Current Dollars for Stack System Closure and using NPV for Long-Term Care if PCS Nitrogen provides the Financial Assurance pursuant to Section III.B (Type B Financial Assurance), below.  NPV shall be calculated using the 30-Year Treasury Constant Maturity Rate, averaged for the previous twelve (12) months (using the average spot rate for each month) from the date of the annual Cost Estimates, and discounted over the time period for which Long-Term Care is required; and

        c.      Include the construction, operation, maintenance, and closure of the Water Treatment Plant, including associated equipment and piping, and Financial Assurance established pursuant to Paragraph 19.a of the Consent Decree shall include such costs, except as provided in Paragraph 3 below.

3.      PCS Nitrogen shall not include in the Cost Estimate:  (1) any credit for salvage value or a zero cost for handling hazardous waste with potential future value, as set forth in LAC 33:V.3705.A.3-4; (2) any costs related to settlement ponds associated with the treatment of Process Wastewater and Leachate (as defined in the Consent Decree and Attachment F, Appendix 1, respectively) that are located outside the footprint of the Phosphogypsum Stack System (*see* Appendix 1, Attachment B) and subject to the Facility's LDEQ-issued Solid Waste Permit P-0201R2 (including re-issuance or modification of the permit); (3) Corrective Action costs in accordance with Paragraph 19.c of the Consent Decree; and (4) groundwater monitoring costs in accordance with Paragraph 17 of the Consent Decree.  Financial Assurance established pursuant to Paragraph 19.a of the Consent Decree shall not include any such costs.

4.      PCS Nitrogen shall submit the Cost Estimate, together with supporting documentation, to EPA in the following manner:

        a.      PCS Nitrogen has submitted the Cost Estimate under Paragraph 1 based on the current costs (i.e., using that year's current prices) for Stack System Closure and Long-Term Care.

        b.      PCS Nitrogen shall submit annually, on the date determined by Paragraph 4.h, below, to EPA an updated Cost Estimate in accordance with this Paragraph 4.

        c.      PCS Nitrogen shall in the annual updated Cost Estimate reflect inflationary adjustments to the prior year's Cost Estimate.  Such inflationary adjustment may be made by

either method in Paragraph 4.c.(1) or 4.c.(2) below, except as otherwise required in this Appendix, Section II, Paragraph 4.e, below:

(1)  Recalculating the costs, in Current Dollars (i.e., OSWER Directive No. 9476.00-5, Section 4.4.1); or

(2)  Using an inflationary factor derived from the most recent Implicit Price Deflator ("Deflator") for the Gross National Product published by the U.S. Department of Commerce in its Survey of Current Business, in the manner as specified by 40 C.F.R. §§ 264.142(b) and 264.144(b).  If the Cost Estimate is due by the end of February, PCS Nitrogen shall:  (i) use the Implicit Price Deflator for the Gross National Product published for Q1, Q2 and Q3 of the prior year, calculate the change in the Deflator between Q1 and Q2, and the change in Deflator between Q2 and Q3, take the average of these values, and add this average to the Q3 Deflator to impute a Q4 Deflator; or (ii) if the Implicit Price Deflator for the Gross National Product has not been published for Q3 of the prior year by February 10 of the following year, PCS Nitrogen shall calculate the change in the published Deflator between Q1 and Q2, adding this value both to the Deflator for Q2 to impute a Q3 Deflator and to the imputed Q3 Deflator to impute a Q4 Deflator. If PCS Nitrogen calculates imputed Deflators by using an average of the change in Deflators from prior quarters, because the actual Implicit Price Deflator for Q3 or Q4 were not then available, annual inflationary adjustments in subsequent years shall be based on the actual Implicit Price Deflator, as and when published values become available.  An example of the inflationary factor calculation is provided in Attachment B of this Appendix (*see* Attachment B, Exhibit 1).

d.     For those years in which PCS is not required to provide an updated Cost Estimate pursuant to Paragraph 4.e below, PCS shall provide the following information, as applicable, with the annual updated Cost Estimate:

(1)  For a proposed Permanent Closure Plan subject to EPA approval in accordance with Section II.(3)(a), Attachment D of Appendix 1 of the Consent Decree, submit with the annual updated Cost Estimate required under Paragraph 4.b., above, a supplement updating any new information (e.g., revised Stack Closure schedule, revised treatment protocols (including chemical treatment quantities); treatment costs; material and labor costs; repurposed lined Components) and cost adjustments to the annual updated Cost Estimate reflecting the updated information.

(2)  For an approved Permanent Closure Plan, provide any cost adjustments to the Cost Estimate due to an approved modification of the Permanent Closure Plan.  These cost adjustments shall be incorporated into the updated Cost Estimate provided under Paragraph 4.b above.

e.     PCS Nitrogen shall:

(1)  Every five (5) years, include with the annual updated Cost Estimate, supporting documentation and updated detailed costs for the Permanent Closure Plan (unless such Permanent Closure Plan has been updated in the prior four (4) years as specified in Paragraph 4.d., above, and needs no further update), reflecting cost adjustments (e.g., revised treatment protocols, additional studies, updated treatment costs, updated material and labor costs, quantity or volume

8

changes, etc.) as specified in Paragraph 4.e.(2), below.  PCS Nitrogen shall provide the Cost Estimate and associated documentation five (5) years after the submittal of the Cost Estimate pursuant to Paragraph 1 of this Appendix, and at five (5)-year intervals thereafter.  PCS Nitrogen shall also provide such an updated Cost Estimate for the Facility:  (i) in the event of a re-evaluation of when the manner and extent of the operation of the Phosphogypsum Stack System makes the Stack System Closure and Long-Term Care the most expensive; (ii) with the submittal of a modification to the Permanent Closure Plan as specified in Appendix 1, Attachment D of the Consent Decree in accordance with Paragraph 4.d.(2), above; and (iii) thirty (30) Days prior to a Facility transfer with the information requested pursuant to Paragraph 27 of this Appendix.

(2)  An update to the Cost Estimate submitted under this Paragraph 4.e. shall be adjusted by including or recalculating the costs, in Current Dollars, as set forth in Paragraph 4.c.(1), above.

(a)  In the event a specific cost needed to prepare the Cost Estimate has been updated pursuant to Paragraph 4.c.(1), above, within one (1) year, PCS Nitrogen may adjust that specific cost pursuant to Paragraph 4.c.(2), above.

(b)  In the event a specific cost needed to prepare the Cost Estimate has not been updated pursuant to Paragraph 4.c.(1), above, within one (1) year and is not otherwise available, then PCS Nitrogen may utilize the most recent update of that specific cost, and adjust that prior cost pursuant to Paragraph 4.c.(2), above, provided that PCS Nitrogen identifies the specific cost and includes a brief explanation for adjusting the cost pursuant to Paragraph 4.c.(2), above.

f.       In the event of a reduction in the Cost Estimate based on Paragraphs f.(1) and f.(2), below, PCS shall include as part of that year's annual updated Cost Estimate the following information:

(1)  For an approved Certification of Closure or Certification of Partial Closure in accordance with Section III, Attachment D of Appendix 1 of the Consent Decree, provide:

(a)  The approved Certification of Closure or Certification of Partial Closure and its accompanying documentation;

(b)  Information specifying the costs listed in the most recent prior annual updated Cost Estimate for the PSS Closure work, specified in the Certification of Closure or Certification of Partial Closure, and for informational purposes updating if needed all relevant information for the costs (e.g., unit cost, volume, quantity, linear feet); and

(c)  An adjustment to that year's annual updated Cost Estimate that removes the costs specified in f.(1)(b), above, for the PSS Closure work covered by the Certification of Closure or Certification of Partial Closure.

(2)  For a verifiable reduction in quantity and/or volume due to the ongoing PSS Closure work for the treatment of Process Wastewater and Leachate or other verifiable completion of PSS Closure work or Long-Term Care (such as a full year of monitoring), provide:

(a)  A description of the completed on-going PSS Closure or Long-Term Care work;

(b)  Information specifying the costs listed in the most recent prior annual updated Cost Estimate for the completed PSS Closure or Long-Term Care work eligible for removal from the Cost Estimate, and updating if needed all relevant information for the remaining PSS Closure or Long-Term Care work and costs (e.g., volume and/or quantity); and

(c)  An adjustment to that year's annual updated Cost Estimate that removes the prior costs associated with the completed PSS Closure and Long-Term Care work specified in f.(2)(b), above.

g.      If providing Financial Assurance under Section III.B (Type B Financial Assurance), in addition to Paragraphs 4.a., 4.b., 4.c. and 4.f., PCS Nitrogen shall include with the Cost Estimate submitted under Paragraph 1 and any updated Cost Estimate, as applicable, the calculation and documentation for the average discount rate used for the NPV.  In addition, the inflation factor to be used to inflate Long-Term Care costs for purposes of deriving the NPV of Long-Term Care shall be the mathematical average of the calculated inflation factors for each year over a five (5)-year period.  Each year's calculated inflation factor shall be the product of dividing the GDP Deflator for the relevant year by the GDP Deflator for the year immediately prior, beginning with the first year in which the GDP Deflator is an estimate and for each year thereafter until the fifth year.  The Gross Domestic Product ("GDP") Deflator is as specified in the "GDP (Chained) Price Index" of the Gross Domestic Product Deflators Used in the Historic Tables (Table 10.1), published by the Office of Management and Budget ("OMB").  If the OMB publication is unavailable, in a written agreement not subject to Court approval under Section XVII (Modification) of the Consent Decree, EPA shall identify another method to derive the inflation factor.

h.      PCS Nitrogen shall submit the annual updated Cost Estimate, in accordance with this Paragraph, seventy-five (75) Days prior to the Anniversary Date of the establishment of the Financial Mechanism, except if otherwise provided herein.  If more than one Financial Mechanism is being used to establish Financial Assurance, the updated Cost Estimate shall be submitted seventy-five (75) Days prior to the earliest Anniversary Date, for a given calendar year, of a Financial Mechanism.  Any EPA comments on an annual updated Cost Estimate that are received by PCS after forty-five (45) Days following the date of submittal of the annual Cost Estimate shall be addressed by PCS in the next annual updated Cost Estimate.

i.      PCS Nitrogen shall submit with all Cost Estimates: (1) updated versions of Tables 3.1 through 3.5 in Attachment B; and (2) Attachment C of this Appendix.

5.      Notwithstanding the provisions of Section XI (Information Collection and Retention) of the Consent Decree, PCS Nitrogen shall maintain the Cost Estimate and updates thereto, or have electronic access to them (such that upon request the information can be readily downloaded and printed), at the Facility for the duration of this Consent Decree.

III.  Financial Assurance for Stack System Closure and Long-Term Care

6.      On or before March 31, 2023, and on the first Anniversary Date and annually thereafter, PCS Nitrogen's CFO shall provide to EPA an originally-signed CFO Certification, together with supporting documentation, confirming that it has established Financial Assurance for Stack System Closure and Long-Term Care, in an amount no less than the Cost Estimate and pursuant to the requirements of either Section III.A (Type A Financial Assurance) or Section III.B (Type B Financial Assurance) of this Appendix, at PCS Nitrogen's election.  During the period between the Effective Date and PCS Nitrogen's first submittal of Financial Assurance under this Appendix 2, PCS Nitrogen shall maintain the financial assurance submitted in March 2022 to satisfy the requirements of Solid Waste Permit P-0201R2.  If LDEQ determines that PCS is not in compliance with the financial assurance terms or conditions in Solid Waste Permit P-0201R2, then PCS Nitrogen shall provide Financial Assurance meeting the requirements of this Appendix 2 within thirty (30) Days of receipt of LDEQ's written determination, notwithstanding any dispute resolution procedures available to PCS Nitrogen under the Solid Waste Permit P-0201R2.

7.      Once PCS Nitrogen establishes Financial Assurance under either Section III.A (Type A Financial Assurance) or Section III.B (Type B Financial Assurance) (hereinafter also known as Section III.A or Section III.B, respectively) for Stack System Closure and Long-Term Care, it shall maintain such Financial Assurance pursuant to the requirements of Section III.A or Section III.B, as applicable.

        a.      If PCS opts to change its provision of Financial Assurance from Section III.A to Section III.B or vice versa, as applicable, then PCS Nitrogen shall submit to EPA for approval: (a) an originally-signed CFO Certification, together with supporting documentation, explaining the requested change; and (b) the proposed Financial Assurance, compliant with the applicable Section III.A or Section III.B requirements, that can become effective within thirty (30) Days of EPA's approval.  PCS Nitrogen shall not cancel its existing Financial Assurance for Stack System Closure and Long-Term Care until it receives EPA's written approval of PCS Nitrogen's request and the alternate Financial Assurance is in effect (e.g., trust fund is funded; insurance policy is in effect).  EPA's determination whether to approve PCS Nitrogen's request to provide alternate Financial Assurance may take into account PCS Nitrogen's ability to promptly comply and PCS Nitrogen's demonstration of compliance with Section III.  EPA's determination to approve PCS Nitrogen's request to provide alternate Financial Assurance shall be subject to Section X (Dispute Resolution), but not judicial review.

        b.      In the event that PCS Nitrogen opts to establish a different Financial Mechanism within the selected Section (within Section III.A or within Section III.B, as applicable) for Financial Assurance, or is required to provide alternate Financial Assurance as set forth in this Appendix 2, PCS shall provide such Financial Assurance in accordance with the applicable requirements of this Appendix.

    A.  Type A Financial Assurance

8.      Financial Assurance for Stack System Closure and Long-Term Care under this Section III.A (Type A Financial Assurance) must comply with the requirements of LAC 33:V.3707.A-I,

11

LAC 33.V.3711.A-I, LAC 33:V.3717, and LAC 33:V.3719, except as clarified and modified in this Section III.A.

9.    PCS Nitrogen shall use the Cost Estimate generated pursuant to Section II (Cost Estimate), above, in lieu of the cost estimates required pursuant to LAC 33:V.3705 and LAC 33:V.3709, to establish Financial Assurance under this Section III.A.  PCS Nitrogen shall establish Section III.A (Type A Financial Assurance) in an amount at least equal to the Cost Estimate.

10.    PCS Nitrogen shall choose from the Financial Mechanisms specified in LAC 33:V.3707.A-F and LAC 33:V.3711.A-F to establish Section III.A (Type A Financial Assurance), provided that, if PCS Nitrogen is using Third-Party Mechanisms (a trust fund, letter of credit, surety bond, or insurance), the Trustee of any trust fund, or the provider of any letter of credit, surety bond, or insurance shall not be a Related Party to PCS Nitrogen.  PCS Nitrogen shall word the Financial Mechanism as specified in LAC 33:V.3719 unless EPA provides an alternate form, e.g., to address more than one beneficiary of the Financial Mechanism (i.e., EPA and the State) or as otherwise provided by this Appendix.  For Financial Assurance specified in (b) and (c) below, establishing EPA as the beneficiary under the Financial Mechanism shall satisfy the requirement for Financial Assurance as to both EPA and LDEQ.

    a.    For a trust fund, PCS Nitrogen shall comply with LAC 33:V.3707.A and LAC 33.V.3711.A, except as modified below:

        (1)  In lieu of complying with LAC 33:V.3707.A.3-4 and LAC 33:V.3711.A.3-4, PCS Nitrogen shall either:

        (a)  Fully fund the trust within thirty (30) Days of the Effective Date of the Consent Decree or within ten (10) Days of EPA's acceptance of PCS Nitrogen's Cost Estimate submitted pursuant to Paragraph 1 of this Appendix, whichever is later; or

        (b)  Submit to EPA for approval within five (5) Days of the Effective Date of the Consent Decree or within five (5) Days of PCS Nitrogen's Cost Estimate submitted pursuant to Paragraph 1 of this Appendix, whichever is later:  (i) an originally-signed CFO Certification, with supporting documentation, explaining in detail PCS Nitrogen's inability to immediately fund the trust fund, and (ii) including a proposal for a pay-in period of no longer than three (3) years, with at least fifty percent (50%) of the Stack System Closure and Long-Term Care Cost Estimate to be funded in the first year.  Any subsequent request for an extension to an approved pay-in period shall be made at least 180 Days before the close of an approved pay-in period, and shall include an originally-signed CFO Certification explaining in detail why a longer pay-in period is needed, together with supporting documentation.  Such approvals by EPA shall be in its unreviewable discretion.

        (2)  If PCS Nitrogen establishes a trust fund after having used one or more Financial Mechanisms in accordance with Section III.A, PCS Nitrogen shall fully fund the trust fund in lieu of complying with LAC 33:V.3707.A.5 and LAC 33:V.3711.A.5.

(3)  In lieu of complying with LAC 33:V.3719.A, PCS Nitrogen shall use the exact wording as specified in Form 1, Attachment D of this Appendix, for the Trust Agreement.  PCS Nitrogen may enter into an addendum to the Trust Agreement ("Addendum") provided that: (a) the Addendum supplements and does not contain terms that conflict, supersede, revise or alter the terms of the Trust Agreement (or the requirements of Appendix 2); and (b) the Addendum is approved by EPA in advance; such approval is within EPA's unreviewable discretion.  A Trust Agreement must be accompanied by a formal certification of acknowledgement (*see* example provided with Trust Agreement, Form 1, Attachment D of this Appendix).

(4)  PCS Nitrogen shall update any associated schedules or exhibits of the Trust Agreement, as appropriate, within sixty (60) Days after a change in the amount of the Cost Estimate.

(5)  In addition to the requirements of LAC 33:V.3707.A and LAC 33:V.3711.A, PCS Nitrogen shall pay all expenses incurred by the Trustee in connection with the administration of the trust fund, including reasonable fees for legal services rendered to the Trustee, and compensation of the Trustee.

b.      For a surety bond guaranteeing payment or performance, PCS Nitrogen shall comply with LAC 33:V.3707.B-C and LAC 33:V.3711.B-C, except that:

(1)  In addition to the requirements of LAC 33:V.3707.B.1 and C.1 and LAC 33:V.3711.B.1 and C.1, PCS Nitrogen shall provide an originally-signed CFO Certification or certification from an officer of A.M. Best or an NRSRO, documenting that the surety has at least a "secured" financial strength rating of "A" by A.M. Best or an equivalent rating by the NRSRO.

(2)  PCS Nitrogen may submit a request for exemption prior to lodging of this Consent Decree, within thirty (30) Days of any Anniversary Date, or at any time PCS Nitrogen proposes to change Financial Mechanisms under Section III.A to use a surety bond guaranteeing payment or performance from a surety that does not meet the "secured" financial strength rating of "A" by A.M. Best or an equivalent rating by the NRSRO, as required by Paragraph 10.b.(1), above.  Such exemption shall be limited to sureties that have a "secured" financial strength rating of no less than "B+" by A.M Best or an equivalent rating by the NRSRO, and PCS Nitrogen shall submit a detailed analysis, including an originally-signed CFO Certification, of why allowing use of the surety will adequately secure the governments' risk at the Facility.  EPA may approve such exemption in writing in its unreviewable discretion (no dispute resolution or judicial review), and set forth any conditions for such exemption.  EPA also may subsequently revoke such exemption in its unreviewable discretion (no dispute resolution or judicial review) with thirty (30) Days' notice to PCS Nitrogen, and PCS Nitrogen within thirty (30) Days of receipt of such notice shall provide alternative Financial Assurance pursuant to this Appendix.  EPA's approval of such exemption is limited to this Consent Decree and the Geismar Facility, in recognition of the case-specific facts related to the Geismar Facility, and does not constitute approval for other facilities that may have separate financial assurance obligations.

(3)  In lieu of complying with LAC 33:V.3707.B.2 and LAC 33:V.3711.B.2, PCS Nitrogen shall use the exact wording as specified in Form 2, Attachment D of this Appendix, for

the wording of the surety bond guaranteeing payment.  In lieu of complying with LAC 33:V.3707.C.2 and LAC 33:V.3711.C.2, PCS Nitrogen shall use the exact wording as specified in Form 3, Attachment D of this Appendix, for the wording of the surety bond guaranteeing performance.  PCS shall use the exact wording as specified in Form 1.A, Attachment D of this Appendix for the wording of the standby trust fund required by LAC 33:V.3707.B.3 and C.3 and LAC 33:V.3711.B.3 and C.3

(4)  In lieu of complying with LAC 33:V.3707.B.4.b and C.5 and LAC 33:V.3711.B.4.b and C.5, in the event that EPA issues notice pursuant to Section VI (Work Take-over) of the Consent Decree that PCS Nitrogen has failed to perform Stack System Closure and/or Long-Term Care, if PCS Nitrogen fails within thirty (30) Days of the Work Take-over Notice to remedy to EPA's satisfaction the circumstances giving rise to EPA's Work Take-over Notice, the surety will become liable on the bond obligations, and EPA may require the surety to meet its obligations pursuant to the terms of the surety bond and Section VI (Work Take-over) of the Consent Decree.  A dispute raised by PCS Nitrogen shall be subject to the dispute resolution provisions set forth in Sections VI (Work Take-over) and X (Dispute Resolution) of the Consent Decree.

(5)  In the event that PCS Nitrogen must provide alternate Financial Assurance subject to EPA approval pursuant to LAC 33:V.3707.B.4.c and C.4.b and LAC 33:V.3711.B.4.c and C.4.b or the surety becomes liable under the terms of the bond upon notification by EPA, due to cancellation (LAC 33:V.3707.B.8 and C.8 and LAC 33:V.3711.B.8 and C.9), a disapproval or notice by EPA shall be subject to dispute resolution to Section X (Dispute Resolution) of the Consent Decree, but not judicial review.  Any dispute raised by PCS Nitrogen shall not prohibit EPA from requiring the surety to place the guaranteed funds into a standby trust during the pendency of the dispute.

c.    For a letter of credit, PCS Nitrogen shall comply with LAC 33:V.3707.D and LAC 33:V.3711.D, except as modified below:

(1)  In addition to the requirements of LAC 33:V.3707.D.1 and LAC 33:V.3711.D.1, as applicable, PCS Nitrogen shall provide an originally-signed CFO Certification documenting that the provider of the letter of credit is a federally insured financial institution or a provider described in 10.c.2 below.

(2)  PCS Nitrogen may submit a request for exemption prior to lodging of this Consent Decree, on or within thirty (30) Days of any Anniversary Date, or at any time PCS Nitrogen proposes to change Financial Mechanisms within Section III.A to use a letter of credit from: (i) an insured bank that is chartered and regulated by the Office of the Comptroller of the Currency; (ii) a state-chartered bank that is supervised by the Federal Deposit Insurance Corporation; or (iii) a state-chartered or state-licensed bank, branch or agency that is a member of or overseen by the Federal Reserve System.  Additionally, the letter of credit must be able to be drawn on a US-domiciled bank, branch or agency.  PCS Nitrogen shall submit a detailed analysis, including an originally-signed CFO Certification, of why allowing use of the provider will adequately secure the governments' risk at the Facility.  EPA may approve such exemption in writing in its unreviewable discretion (no dispute resolution or judicial review), and set forth any

14

conditions for such exemption. EPA also may subsequently revoke such exemption in its unreviewable discretion with thirty (30) Days' notice to PCS Nitrogen, and PCS Nitrogen within thirty (30) Days of receipt of such notice shall provide alternative Financial Assurance pursuant to this Appendix. EPA's approval of such exemption is limited to this Consent Decree and the Geismar Facility, in recognition of the case-specific facts related to the Geismar Facility, and does not constitute approval for other facilities that may have separate financial assurance obligations.

(3) In lieu of complying with LAC 33:V.3707.D.2, LAC 33:V.3711.D.2 and LAC 33:V.3719.D, PCS Nitrogen shall use the exact wording as specified in Form 4, Attachment D of this Appendix, for the letter of credit and the associated cover letter accompanying the letter of credit. PCS shall use the exact wording as specified in Form 1.A, Attachment D of this Appendix for the wording of the standby trust fund required by LAC 33:V.3707.D.3 and LAC 33:V.3711.D.3.

(4) In lieu of complying with LAC 33:V.3707.D.8 and LAC 33:V.3711.D.9, in the event that EPA issues notice pursuant to Section VI (Work Take-over) of the Consent Decree that PCS Nitrogen has failed to perform Stack System Closure and/or Long-Term Care, if PCS Nitrogen fails within thirty (30) Days of the Work Take-over Notice to remedy to EPA's satisfaction the circumstances giving rise to EPA's Work Take-over Notice, EPA may draw on the letter of credit pursuant to the terms of the letter of credit and Section VI (Work Take-over) of the Consent Decree. A dispute raised by PCS Nitrogen shall be subject to the dispute resolution provisions set forth in Sections VI (Work Take-over) and X (Dispute Resolution) of the Consent Decree.

(5) In the event that PCS Nitrogen must provide alternate Financial Assurance subject to EPA approval pursuant to LAC 33:V.3707.D.9 and LAC 33:V.3711.D.10, or EPA draws on the letter of credit due to cancellation (LAC 33:V.3707.D.9 and LAC 33:V.3711.D.10), a disapproval or drawing on the letter of credit by EPA shall be subject to dispute resolution pursuant to Section X (Dispute Resolution) of the Consent Decree, but not judicial review. Any dispute raised by PCS Nitrogen shall not prohibit EPA from drawing on the letter of credit during the pendency of the dispute.

d.    For insurance, PCS Nitrogen shall comply with LAC 33:V.3707.E and LAC 33:V.3711.E, and shall provide an originally-signed CFO Certification or certification from an officer of A.M. Best or an NRSRO, documenting that the insurer has at least a "secured" financial strength rating of "A" by A.M. Best or an equivalent rating by the NRSRO. PCS Nitrogen also shall:

(1) Comply with LAC 33:V.3707.E.8 and LAC 33:V.3711.E.8, except that in lieu of the conditions set forth in LAC 33:V.3707.E.8.a-e and LAC 33:V.3711.E.a-e that specify when a policy will remain in full force and effect notwithstanding a failure to pay the premium, the following conditions are substituted: (a) EPA determines that the Facility has been abandoned; (b) the Work required under this Consent Decree is undertaken by EPA; (c) Stack System Closure, Partial Closure, and/or Long-Term Care is ordered by EPA or by a U.S. District Court or other court of competent jurisdiction; (d) PCS Nitrogen is named as debtor in a voluntary or

15

involuntary proceeding under Title 11 of the U.S. Code (Bankruptcy); or (e) the premium due is paid.

(2)  In lieu of complying with LAC 33:V.3707.E.2 and LAC 33:V.3711.E.2, PCS Nitrogen shall use the exact wording as specified in Form 5, Attachment D of this Appendix, for the wording of the Certificate of Insurance.

(3)  Submit annually a Certificate of Insurance and a complete copy of the insurance policy, including amendments and endorsements.

(4)  Notify EPA if it has cause to believe that it will not be able to make a premium payment.

(5)  Ensure the assignment requirements of LAC 33:V.3707.E.7 and LAC 33:V.3711.E.7 are incorporated into the insurance policy exactly as written, with no additional qualifying conditions.

(6)  Ensure that the policy does not allow or offer coverage for liabilities other than those contemplated by the Consent Decree.

e.    For the corporate financial test, PCS Nitrogen shall comply with LAC 33:V.3707.F and LAC 33:V.3711.F, except that:

(1)  In lieu of complying with LAC 33:V.3707.F.1.b.i and LAC 33:V.3711.F.1.b.i, PCS Nitrogen (or PCS's Guarantor) shall use a Standard & Poor's ("S&P") Long-Term Issuer Credit Rating or Moody's long-term Corporate Family Rating, which assesses a company's capacity to meet its long-term (greater than one (1) year) financial commitments, as they come due.  The rating must be BBB or greater as issued by S&P, or Baa2 or greater as issued by Moody's.  If PCS Nitrogen has more than one rating, the lower of the two will be used to meet the criteria in LAC 33:V.3707.F and LAC 33:V.3711.F.  If PCS Nitrogen has multiple ratings and discontinues a rating that is below BBB (S&P) or Baa2 (Moody's), or a rating agency discontinues a rating that is below BBB (S&P) or Baa2 (Moody's), such that the remaining rating(s) subsequently would enable PCS Nitrogen to satisfy the corporate financial test criteria, PCS Nitrogen shall provide alternate Financial Assurance and shall be disqualified from using the corporate financial test for two (2) years.

(2)  The phrase "all Environmental Obligations" is substituted for "current closure and post-closure cost estimates and current plugging and abandonment cost estimates" found in LAC 33:V.3707.F.1 and LAC 33:V.3711.F.1.

(3)  The term "assets" specified in LAC 33:V.3707.F.1.a.iv and b.iv and LAC 33:V.3711.F.1.a.iv and b.iv shall be replaced by the term "Tangible Assets."

(4)  In lieu of complying with LAC 33:V.3707.F.3 and LAC 33:V.3711.F.3, PCS Nitrogen shall document its satisfaction of the corporate financial test by submitting to EPA within ninety (90) Days after the close of PCS Nitrogen's fiscal year, for each year PCS Nitrogen is providing a Self-Assurance Mechanism:

(a)  A letter signed by PCS Nitrogen's CFO worded exactly as specified in Form 6-A, Attachment D of this Appendix ("CFO Letter").

(b)  A copy of the independent CPA report on examination of PCS Nitrogen's audited financial statements for the latest completed fiscal year that PCS Nitrogen is using for the basis of the financial test.

(c)  A copy of the Independently Audited financial statements for the last completed year, which may be submitted subject to a claim of Confidential Business Information consistent with federal and state laws and Paragraph 69 of the Consent Decree if such statements are those of a privately-held company.

(d)  A report of procedures and findings from PCS Nitrogen's independent CPA resulting from an agreed-upon procedures engagement performed in accordance with the AICPA Statement on Standards for Attestation Engagements, AT Section 201 – Agreed Upon Procedures Engagements (including AICPA related attestation interpretations), as updated, that describes the procedures performed and related findings, including whether or not differences or discrepancies were found in the comparison of financial information set out in the letter (including attachments and exhibits) from PCS Nitrogen's CFO and PCS Nitrogen's Independently Audited, year-end financial statements for the last fiscal year, including all attachments.  Where differences or discrepancies exist between PCS Nitrogen's CFO Letter and PCS Nitrogen's Independently Audited year-end financial statements, the report of procedures and findings will reconcile any differences or discrepancies between the values or information represented in PCS Nitrogen's CFO Letter and PCS Nitrogen's Independently Audited financial statements.  Procedures to be performed by the independent CPA shall be in accordance with AT Section 201.

(5)  In addition to complying with 40 LAC 33:V.3707.F.6 and LAC 33:V.3711.F.6, if PCS Nitrogen determines at any time during the fiscal year that it no longer meets or will not meet the requirements of this Paragraph 10.e., PCS Nitrogen shall provide alternate Financial Assurance pursuant to the requirements of Section III.A (Type A Financial Assurance) within thirty (30) Days of such determination, unless PCS Nitrogen has requested a compliance plan and schedule pursuant to Section VI (Temporary Non-Compliance) of this Appendix.  If EPA determines that PCS Nitrogen has failed to provide alternate Financial Assurance as required by this Paragraph 10.e.(5), such determination by EPA is not subject to dispute resolution pursuant to Section X (Dispute Resolution) of the Consent Decree, and is not subject to judicial review.

(6)  Within thirty (30) Days of notice from EPA that EPA, pursuant to LAC 33:V.3707.F.7 and LAC 33:V.3711.F.7, no longer believes that PCS Nitrogen meets the requirements of the corporate financial test criteria of Paragraph 10.e., or that EPA disallows the use of the corporate financial test based on qualifications in the opinion expressed by the independent CPA as set out in LAC 33:V.3707.F.8 and LAC 33:V.3711.F.8, PCS Nitrogen shall establish alternate Financial Assurance as required by LAC 33:V.3707.F.7 and 8 and LAC 33:V.3711.F.7 and 8 pursuant to this Section III.A (Type A Financial Assurance).  PCS Nitrogen's failure to timely establish alternate Financial Assurance is not subject to Section VI (Temporary Non-Compliance) of this Appendix.  EPA's determination to disallow the Financial

17

Assurance provided by the Self-Assurance Mechanism based on PCS Nitrogen's (or PCS Nitrogen's Guarantor's) independent CPA's adverse or disclaimer opinion based on examination of the financial statement's shall be subject to dispute resolution under Section X (Dispute Resolution) of the Consent Decree, but shall not be subject to judicial review.

(7)  In addition to complying with LAC 33:V.3707.F and LAC 33:V.3711.F, PCS Nitrogen shall:

(a)  If more than sixty percent (60%) of PCS Nitrogen's Tangible Assets are in the form of one (1) or more note receivables from one (1) or more Related Parties, submit to EPA, when providing the information required by Paragraph 10.e.(4), above, and LAC 33:V.3707.F.5 and LAC 33:V.3711.F.5, an originally-signed CFO Certification together with a list of each note receivable, the name of the Related Party and a description (along with any necessary documentation) of the Related Party's financial strength, to demonstrate that each Related Party maintains the financial strength to meet its obligation to PCS Nitrogen.

(b)  On a quarterly basis, using the sum of the most recent four (4) quarters' financial statements (including balance sheets, income statements, and cash flow statements), compiled by a CPA, evaluate PCS Nitrogen's ability to meet the criteria of the corporate financial test.  This evaluation shall be made available to EPA.  Upon review of the evaluation, EPA can, in its unreviewable discretion (no dispute resolution or judicial review), require that a follow-up evaluation be conducted by a CPA independent of PCS Nitrogen or its Affiliates and/or Related Parties.

f.    For the Corporate Guarantee, PCS Nitrogen shall provide a Corporate Guarantee pursuant to, and otherwise comply with, LAC 33:V.3707.F.10 and LAC 33:V.3711.F.11, as modified by Paragraph 10.e., above, and shall meet the requirements specified below:

(1)  PCS Nitrogen may use a Non-U.S. Corporation as Guarantor only if the following conditions are met:  (a) the Non-U.S. Corporation has identified a registered agent for service of process in the State in which the facility covered by the Guarantee is located and in the State in which it has its principal place of business; (b) PCS Nitrogen submits to EPA a written legal opinion from an Independent Attorney, prior to the execution of the Guarantee, confirming that a Guarantee executed as required under this Section by the non-U.S. Guarantor is a legally valid and an enforceable obligation in the State(s); (c) the Non-U.S. Corporation provides Independently Audited financial statements in conformance with GAAP; (d) the total amount of the Non-U.S. Corporation's present and proposed Guarantees (including self-guarantees) to cover all Environmental Obligations in the United States shall not exceed twenty-five percent (25%) of the Non-U.S. Corporation's Tangible Net Worth in the United States; and (e) the written Guarantee reflects the Non-U.S. Corporation's (Guarantor's) agreement to comply with the reporting requirements required under the Consent Decree and that within thirty (30) Days of executing the Guarantee, the Guarantor will establish a stand-by trust with a financial institution within the continental United States, Alaska, or Hawaii.

18

(2)  PCS Nitrogen shall use the exact wording as specified in Form 7, Attachment D of this Appendix, for the Corporate Guarantee.  The certified copy of the Corporate Guarantee must accompany the items sent to EPA, in accordance with Section XIV (Notices) of the Consent Decree, as specified in Paragraph 10.e.(4) of this Appendix.

11.    If PCS Nitrogen seeks to provide:

a.    More than one Third-Party Mechanism to demonstrate Financial Assurance for Stack System Closure and Long-Term Care, pursuant to LAC 33:V.3707.G and LAC 33:V.3711.G, PCS Nitrogen shall submit to EPA an originally-signed CFO Certification verifying that the Third-Party Mechanisms do not incorporate terms subrogating one Financial Mechanism to another, i.e., designating a prioritization for the release of the funds or the payment of a claim. EPA, if the need arises, will determine in its unreviewable discretion (no dispute resolution or judicial review) the priority for the release of funds or payment of a claim.

b.    A Financial Mechanism establishing Financial Assurance at more than one facility pursuant to LAC 33:V.3707.H and LAC 33:V.3711.H, PCS Nitrogen:

(1)  Shall not provide a single trust fund or insurance policy to cover the multiple facilities in different states, but shall provide each affected state with its own distinct trust fund or insurance policy;

(2)  May use the same letter of credit or surety bond for multiple facilities provided that the following conditions are met:  (a) the facilities' EPA Identification Numbers, names, addresses, and the Stack System Closure and Long-Term Care Cost Estimate(s) associated with each particular facility are clearly specified in the Financial Mechanism; and (b) the Financial Mechanism clearly states that there can be a release of funds for a specified facility without requiring the entire obligation covered by the Financial Mechanism to be placed in the standby trust(s); and

(3)  Shall not release funds designated for one or more facilities in another state except upon written agreement of EPA, PCS Nitrogen, and the affected state(s).

B.  Type B Financial Assurance

12.    Financial Assurance under this Section III.B (Type B Financial Assurance) must comply with the requirements of LAC 33:V.3707.A-B and D-I, LAC 33:V.3711.A-B and D-I, LAC 33:V.3717 and LAC 33:V.3719, except as clarified and modified in this Section III.B (including Attachment E of this Appendix).  PCS Nitrogen shall use the Cost Estimates generated pursuant to Section II (Cost Estimate), above, in lieu of the cost estimates required pursuant to LAC 33:V.3705 and LAC 33:V.3709, to establish Financial Assurance under this Section III.B.  PCS Nitrogen shall provide Section III.B (Type B Financial Assurance) in an amount at least equal to the Cost Estimate.

13.    The options and requirements for Type B Financial Assurance depend upon PCS Nitrogen's threshold rating, which shall be based on:  (a) current S&P Long-Term Issuer Credit Rating of AAA through BB-; (b) current Moody's Corporate Family Rating of Aaa though Ba3;

19

or (c) an equivalent current rating from an NRSRO that assesses a company's capacity to meet its long-term (greater than one (1) year) financial commitments, as they come due. If PCS Nitrogen has more than one rating, it shall use the lowest rating to determine its threshold rating.

14.     If PCS Nitrogen qualifies to use a Self-Assurance Mechanism based on its threshold rating and Attachment E, PCS Nitrogen shall use only one Self-Assurance Mechanism. When required under Attachment E to provide a Third-Party Mechanism in combination with a Self-Assurance Mechanism, PCS Nitrogen shall use a trust fund unless permitted to substitute another type of Third-Party Mechanism pursuant to Paragraphs 16 and 17, below. PCS Nitrogen shall meet the minimum threshold amount specified in Attachment E to be funded in, or covered by, a Third-Party Mechanism.

15.     PCS Nitrogen shall use the Financial Mechanisms specified in LAC 33:V.3707.A-B and D-F and LAC 33:V.3711.A-B and D-F to establish Type B Financial Assurance as set out in Attachment E and below, provided that, if PCS Nitrogen is using Third-Party Mechanisms (a trust fund, letter of credit, surety bond guaranteeing payment, or insurance), the Trustee of any trust fund, or the provider of any letter of credit, surety bond guaranteeing payment, or insurance shall not be a Related Party to PCS Nitrogen. PCS Nitrogen shall word the Financial Mechanism as specified in LAC 33:V.3719, unless EPA provides an alternate form, e.g., to address more than one beneficiary of the Financial Mechanism (i.e., EPA and the State). For Financial Assurance specified in (b) and (c) below, establishing EPA as the beneficiary under the Financial Mechanism shall satisfy the requirement for Financial Assurance as to both EPA and LDEQ. PCS Nitrogen shall not request pursuant to LAC 33:V.3707.A.7-8, B-7, D-7 and E.9 and LAC 33:V.3711.A.7-8, B-7, D-7 and E.9 that the corpus of the trust fund, the penal sum of the payment surety bond, the value of the letter of credit, or the limit of liability of the insurance policy be reduced to reflect reductions in the Cost Estimates until such time as the updated Cost Estimate is equivalent to the corpus of the trust fund, the penal sum of the payment surety bond, the value of the letter of credit, or the limit of liability of the insurance policy. In addition, PCS Nitrogen shall comply with the requirements of LAC 33:V.3707.A.10 and E.5 and LAC 33:V.3711.A.11 and E.9 if requesting reimbursement from a trust fund or filing an insurance policy claim, except as provided for in Paragraph 19 of this Appendix. If Financial Assurance is provided by multiple Third-Party Mechanisms pursuant to Paragraph 17 of this Appendix, the individual value of the Third-Party Mechanisms shall not be reduced to reflect any reductions in the Cost Estimate until such time as the updated Cost Estimate is equivalent to the sum of the total obligations covered by the Third-Party Mechanisms.

        a.     For a trust fund, PCS Nitrogen shall comply with LAC 33:V.3707.A and LAC 33:V.3711.A, except that:

            (1)  In lieu of complying with LAC 33:V.3707.A.3-4 and LAC 33:V.3711.A.3-4, PCS Nitrogen shall fully fund the trust within thirty (30) Days of the Effective Date of the Consent Decree or within ten (10) Days of EPA's acceptance of PCS Nitrogen's Cost Estimate submitted pursuant to Paragraph 1 of this Appendix, whichever is later, as specified in Paragraph 6. If PCS Nitrogen is unable to fully fund the trust fund, PCS Nitrogen within five (5) Days of the Effective Date of the Consent Decree or five (5) Days of EPA's acceptance of the initial Cost Estimate pursuant to Paragraph 1 of this Appendix, whichever is later, shall submit to EPA for approval:

(i) an originally-signed CFO Certification, with supporting documentation, explaining in detail PCS Nitrogen's inability to immediately fund the trust fund, and (ii) including a proposal for a pay-in period of no longer than three (3) years, with at least fifty percent (50%) of the Cost Estimate submitted pursuant to Paragraph 1 of this Appendix, to be funded in the first year.  Any subsequent request for an extension to an approved pay-in period shall be made at least 180 Days before the close of an approved pay-in period, and shall include an originally-signed CFO Certification explaining in detail why a longer pay-in period is needed, together with supporting documentation.  Such approvals by EPA shall be in its unreviewable discretion (no dispute resolution or judicial review).

(2)  In lieu of complying with LAC 33:V.3707.A.5 and LAC 33:V.3711.A.5, if PCS Nitrogen is establishing a trust fund after having used one or more Financial Mechanisms in accordance with Section III.A for Financial Assurance, PCS Nitrogen shall fully fund the trust fund.

(3)  In lieu of complying with LAC 33:V.3719.A, PCS Nitrogen shall use the exact wording as specified in Form 1, Attachment D of this Appendix, for the Trust Agreement.  PCS Nitrogen may enter into an addendum to the Trust Agreement ("Addendum") provided that: (a) the Addendum supplements and does not contain terms that conflict, supersede, revise or alter the terms of the Trust Agreement (or the requirements of Appendix 2); and (b) the Addendum is approved by EPA in advance; such approval is within EPA's unreviewable discretion (no dispute resolution or judicial review).  The Trust Agreement must be accompanied by a formal certification of acknowledgment (*see* example provided with Trust Agreement, Form 1, Attachment D of this Appendix).

(4)  PCS Nitrogen shall update Schedule A of the Trust Agreement within sixty (60) Days after a change in the amount of the Cost Estimate.

(5)  In addition to the requirements of LAC 33:V.3707.A and LAC 33:V.3711.A, PCS Nitrogen shall pay all expenses incurred by the Trustee in connection with the administration of the trust fund, including fees for legal services rendered to the Trustee and compensation of the Trustee.

b.     For a surety bond guaranteeing payment, PCS Nitrogen shall comply with LAC 33:V.3707.B and LAC 33:V.3711.B, except that:

(1)  In addition to the requirements of LAC 33:V.3707.B.1 and LAC 33:V.3711.B.1 PCS Nitrogen shall provide an originally-signed CFO Certification or certification from an officer of A.M. Best or an NRSRO, documenting that the surety has at least a "secured" financial strength rating of "A" by A.M. Best or an equivalent rating by the NRSRO.

(2)  PCS may submit a request for exemption prior to lodging of this Consent Decree, on or within thirty (30) Days of any Anniversary Date, or at any time PCS Nitrogen proposes to change Financial Mechanisms within Section III.B to use a surety bond guaranteeing payment or performance from a surety that does not meet the required "secured" financial strength rating of "A" by A.M. Best or an equivalent rating by the NRSRO.  Such exemption shall be limited to

sureties that have a "secured" financial strength rating of no less than "B+" by A.M Best or an equivalent rating by the NRSRO, and PCS Nitrogen shall submit a detailed analysis, including an originally-signed CFO Certification, of why allowing use of the surety will adequately secure the governments' risk at the Facility. EPA may approve such exemption in writing in its unreviewable discretion (no dispute resolution or judicial review), and set forth any conditions for such exemption. EPA also may subsequently revoke such exemption in its unreviewable discretion with thirty (30) Days' notice to PCS Nitrogen, and PCS Nitrogen within thirty (30) Days of receipt of such notice shall provide alternative Financial Assurance pursuant to this Appendix. EPA's approval of such exemption is limited to this Consent Decree and the Geismar Facility, in recognition of the case-specific facts related to the Geismar Facility, and does not constitute approval for other facilities that may have separate financial assurance obligations.

(3) In lieu of complying with LAC 33:V.3707.B.2 and LAC 33:V.3711.B.2, PCS Nitrogen shall use the exact wording as specified in Form 2, Attachment D of this Appendix, for the wording of the surety bond guaranteeing payment. PCS shall use the exact wording as specified in Form 1.A, Attachment D of this Appendix for the wording of the standby trust fund required by LAC 33:V.3707.B.3 and LAC 33:V.3711.B.3.

(4) In lieu of complying with LAC 33:V.3707.B.4.b and LAC 33:V.3711.B.4.b, in the event that EPA issues notice pursuant to Section VI (Work Take-over) of the Consent Decree that PCS Nitrogen has failed to perform Stack System Closure and/or Long-Term Care, if PCS Nitrogen fails within thirty (30) Days of the Work Take-over Notice to remedy to EPA's satisfaction the circumstances giving rise to EPA's Work Take-over Notice, the surety will become liable on the bond obligations and EPA may require the surety to meet its obligations pursuant to the terms of the surety bond and Section VI (Work Take-over) of the Consent Decree. A dispute raised by PCS Nitrogen shall be subject to the dispute resolution provisions set forth in Sections VI (Work Take-over) and X (Dispute Resolution) of the Consent Decree.

(5) In the event that PCS Nitrogen must provide alternate Financial Assurance subject to EPA's approval pursuant to LAC 33:V.3707.B.4.c and LAC 33:V.3711.B.4.c or the surety becomes liable under the terms of the bond upon notification by EPA, due to cancellation (LAC 33:V.3707.B.8 and LAC 33:V.3711.B.8), a disapproval or notice by EPA shall be subject to dispute resolution to Section X (Dispute Resolution) of the Consent Decree, but not judicial review. Any dispute raised by PCS Nitrogen shall not prohibit EPA from requiring the surety to place the guaranteed funds into a standby trust during the pendency of the dispute.

c.    For a letter of credit, PCS Nitrogen shall comply with LAC 33:V.3707.D and LAC 33:V.3711.D, except that:

(1) In addition to the requirements of LAC 33:V.3707.D.1 and LAC 33:V.3711.D.1, PCS Nitrogen shall provide an originally-signed CFO Certification documenting that the provider of the letter of credit is a federally insured financial institution or a provider described in 15.c.2 below.

(2) PCS Nitrogen may submit a request for exemption prior to lodging of this Consent Decree, within thirty (30) days of any Anniversary Date, or at any time PCS Nitrogen proposes to

22

change Financial Mechanisms within Section III.B to use a letter of credit from:  (i) an insured bank that is chartered and regulated by the Office of the Comptroller of the Currency; (ii) a state-chartered bank that is supervised by the Federal Deposit Insurance Corporation; or (iii) a state-chartered or state-licensed bank, branch or agency that is a member of or overseen by the Federal Reserve System.  Additionally, the letter of credit must be able to be drawn on a US-domiciled bank, branch or agency.  PCS Nitrogen shall submit a detailed analysis, including an originally-signed CFO Certification, of why allowing use of the provider will adequately secure the governments' risk at the Facility.  EPA may approve such exemption in writing in its unreviewable discretion (no dispute resolution or judicial review), and set forth any conditions for such exemption.  EPA also may subsequently revoke such exemption in its unreviewable discretion with thirty (30) Days' notice to PCS Nitrogen, and PCS Nitrogen within thirty (30) Days of receipt of such notice shall provide alternative Financial Assurance pursuant to this Appendix.  EPA's approval of such exemption is limited to this Consent Decree and the Geismar Facility, in recognition of the case-specific facts related to the Geismar Facility, and  does not constitute approval for other facilities that may have separate financial assurance obligations.

(3)  In lieu of complying with LAC 33:V.3707.D.2, LAC 33:V.3711.D.2 and LAC 33:V.3719.D, PCS Nitrogen shall use the exact wording as specified in Form 4, Attachment D of this Appendix, for the wording of the letter of credit and the associated cover letter accompanying the letter of credit.  PCS shall use the exact wording as specified in Form 1.A, Attachment D of this Appendix for the wording of the standby trust fund required by LAC 33:V.3707.D.3 and LAC 33:V.3711.D.3.

(4)  In lieu of complying with LAC 33:V.3707.D.8 and LAC 33:V.3711.D.9, in the event that EPA issues notice pursuant to Section VI (Work Take-over) of the Consent Decree that PCS Nitrogen has failed to perform Stack System Closure and/or Long-Term Care, if PCS Nitrogen fails within thirty (30) Days of the Work Take-over Notice to remedy to EPA's satisfaction the circumstances giving rise to EPA's  Work Take-over Notice, EPA may draw on the letter of credit pursuant to the terms of the letter of credit and Section VI (Work Take-over) of the Consent Decree.  A dispute raised by PCS Nitrogen shall be subject to the dispute resolution provisions set forth in Sections VI (Work Take-over) and X (Dispute Resolution) of the Consent Decree.

(5)  In the event that PCS Nitrogen must provide alternate Financial Assurance subject to EPA's approval pursuant to LAC 33:V.3707.D.9 and LAC 33:V.3711.D.10 or EPA draws on the letter of credit due to cancellation (LAC 33:V.3707.D.9 and LAC 33:V.3711.D.10), a disapproval or drawing on the letter of credit by EPA shall be subject to dispute resolution pursuant to Section X (Dispute Resolution) of the Consent Decree, but not judicial review.  Any dispute raised by PCS Nitrogen shall not prohibit EPA from drawing on the letter of credit during the pendency of the dispute.

d.      For insurance, PCS Nitrogen shall comply with LAC 33:V.3707.E and LAC 33:V.3711.E, and shall provide an originally-signed CFO Certification or certification by an officer of A.M. Best or an NRSRO, documenting that the insurer has at least a "secured" financial strength rating of "A" by A.M. Best or an equivalent rating by the NRSRO.  PCS Nitrogen also shall:

23

(1)  Comply with LAC 33:V.3707.E.8 and LAC 33:V.3711.E.8, except that in lieu of the conditions set forth in LAC 33:V.3707.E.8.a-e and LAC 33:V.3711.E.8.a-e that specify when a policy will remain in full force and effect notwithstanding a failure to pay the premium, the following conditions are substituted:  (a) EPA determines that the Facility has been abandoned; (b) the Work required under this Consent Decree is undertaken by EPA; (c) Stack System Closure, Partial Closure, and/or Long-Term Care is ordered by EPA or by a U.S. District Court or other court of competent jurisdiction; (d) PCS is named as debtor in a voluntary or involuntary proceeding under Title 11 (Bankruptcy), U.S. Code; or (e) the premium due is paid.

(2)  In lieu of complying with LAC 33:V.3707.E.2, LAC 33:V.3711.E.2 and LAC 33:V.3719.E, PCS Nitrogen shall use the exact wording as specified in Form 5, Attachment D of this Appendix, for the wording of the Certificate of Insurance.

(3)  Submit annually a Certificate of Insurance and a complete copy of the insurance policy, including amendments and endorsements.

(4)  Notify EPA if it has cause to believe that it will not be able to make a premium payment.

(5)  Ensure that the assignment requirements of LAC 33:V.3707.E.7 and LAC 33:V.3711.E.7 are incorporated into the insurance policy exactly as written, with no additional qualifying conditions.

(6)  Ensure that the policy does not allow or offer coverage for liabilities other than those contemplated by the Consent Decree.

e.    For the corporate financial test and Corporate Guarantee, PCS Nitrogen shall comply with LAC 33:V.3707.F and LAC 33:V.3711.F, except that:

(1)  The phrase "all Environmental Obligations" is substituted for "current closure and post-closure cost estimates and current plugging and abandonment cost estimates" found in LAC 33:V.3707.F.1 and LAC 33:V.3711.F.1.

(2)  In lieu of complying with LAC 33:V.3707.F.1.a-b and LAC 33:V.3711.F.1.a-b, PCS Nitrogen shall:

(a)  Meet the corporate financial test criteria specified in Attachment E which corresponds to PCS Nitrogen's rating threshold as specified in Paragraph 13, above.  If PCS Nitrogen has multiple ratings and discontinues, or S&P, Moody's, or an NRSRO discontinues, the lower of the ratings, PCS Nitrogen shall, for a period of two (2) years commencing on PCS Nitrogen's fiscal year-end, apply the criteria and requirements of Attachment E (and this Paragraph) as if the lower rating were in effect.  If during that two (2)-year period, a change in PCS Nitrogen's other rating(s) results in PCS Nitrogen not satisfying the corporate financial test or becoming subject to a more stringent set of corporate financial test criteria under Attachment E, PCS Nitrogen shall provide Financial Assurance as specified in Paragraph 15.e.(4)(b) or Paragraph 18.

24

(b)  Calculate the three (3)-year rolling average specified in Attachment E for the Debt-to-Equity Ratio (TL/NW), Current Ratio, or the Operating Cash Flow metric ("OCF metric") as follows: (i) TL/NW is a three (3)-year rolling average of total Liabilities divided by three (3)-year rolling average of Net Worth; (ii) CA/CL is a three (3)-year rolling average of Current Assets divided by three (3)-year rolling average of Current Liabilities; and (iii) OCF metric is a three (3)-year rolling average of Operating Cash Flow, except for an S&P rating of BB-, Moody's rating of Ba3 or an equivalent rating from an NRSRO who shall calculate the OCF metric annually.

(c)  Not use the OCF metric to demonstrate Financial Assurance if PCS Nitrogen has a negative cash flow for that fiscal year.

(3)  In lieu of complying with LAC 33:V.3707.F.3 and LAC 33:V.3711.F.3, PCS Nitrogen shall document its satisfaction of the corporate financial test by submitting to EPA within ninety (90) Days after the close of PCS Nitrogen's fiscal year, for each year PCS Nitrogen is providing a Self-Assurance Mechanism:

(a)  A letter signed by PCS Nitrogen's CFO worded exactly as specified in Form 6-B, Attachment D of this Appendix.

(b)  A copy of the independent CPA report on examination of PCS Nitrogen's audited financial statements for the latest completed fiscal year that PCS Nitrogen is using for the basis of the financial test.

(c)  A copy of the Independently Audited financial statements for the last completed year, which may be submitted subject to a claim of Confidential Business Information consistent with state and federal laws and Paragraph 69 of the Consent Decree if such financial statements are those of a private company.

(d)  A report of procedures and findings from PCS Nitrogen's independent CPA, resulting from an agreed-upon procedures engagement performed in accordance with the AICPA Statement on Standards for Attestation Engagements, AT Section 201 - Agreed Upon Procedures Engagements (including AICPA related attestation interpretations), as updated, that describes the procedures performed and related findings, including whether or not differences or discrepancies were found in the comparison of financial information set out in the letter (including attachments and exhibits) from PCS Nitrogen's CFO and PCS Nitrogen's Independently Audited, year-end financial statements for the last fiscal year, including all attachments.  Where differences or discrepancies exist between PCS Nitrogen's CFO Letter and PCS Nitrogen's Independently Audited year-end financial statements, the report of procedures and findings will reconcile any differences or discrepancies between the values or information represented in PCS Nitrogen's CFO Letter and PCS Nitrogen's Independently Audited financial statements.  Procedures to be performed by the independent CPA shall be in accordance with AT Section 201.

(4)  In addition to complying with LAC 33:V.3707.F.6 and LAC 33:V.3711.F.6, if PCS Nitrogen determines at any time during the fiscal year that:

(a)  PCS Nitrogen no longer meets or will not meet the requirements of this Paragraph 15.e. (including the loss of a threshold rating except as provided by Paragraph 15.e.(2)(a), above), PCS Nitrogen shall within ten (10) Days send written notice to EPA of this determination, by certified mail, stating the basis for such a determination.  PCS Nitrogen, within thirty (30) Days of its notice to EPA as specified above, shall provide alternate Financial Assurance for Stack System Closure and Long-Term Care pursuant to Paragraph 18, below, unless PCS Nitrogen has requested and been approved for a compliance plan and schedule pursuant to Section VI (Temporary Non-Compliance) of this Appendix, or provided notice and is in compliance with Section VII (Compliance Schedule) of this Appendix.

(b)  PCS Nitrogen's threshold rating requires PCS Nitrogen to change from one set of corporate financial test criteria under Paragraph 15.e.(2), above, and Attachment E (e.g., CFT Criteria A) to a more stringent set of corporate financial test criteria (e.g., CFT Criteria C), PCS Nitrogen shall notify EPA within ten (10) Days of the change in corporate financial test criteria and within thirty (30) Days of such notice shall submit to EPA a revised corporate financial test or Corporate Guarantee based on the most recent evaluation conducted under Paragraph 15.e.(6)(c), below, demonstrating compliance with the more stringent corporate financial test criteria.  To the extent necessary, PCS Nitrogen shall, at the same time, make a contribution to the Third-Party Mechanism to comply with the minimum threshold amount specified in the corporate financial test requirements in Paragraph 15.e.(2), above.

(c)  If EPA determines that PCS Nitrogen has failed to provide alternate Financial Assurance or otherwise comply with Paragraphs 15.e.(4)(a) and (4)(b), such determination by EPA is not subject to dispute resolution pursuant to Section X (Dispute Resolution) of the Consent Decree, and is not subject to judicial review.

(5)  Within thirty (30) Days of notice by EPA that EPA, pursuant to LAC 33:V.3707.F.7 and LAC 33:V.3711.F.7, no longer believes that PCS Nitrogen meets the corporate financial test criteria in Paragraph 15.e.(2), above, or that EPA disallows the use of the corporate financial test based on qualifications in the opinion expressed by the independent CPA as set forth in LAC 33:V.3707.F.8 and LAC 33:V.3711.F.8, PCS Nitrogen shall provide alternate Financial Assurance as required by LAC 33:V.3707.F.7 and 8 and LAC 33:V.3711.F.7 and 8 pursuant to Paragraph 18 of this Appendix.  PCS Nitrogen's failure to timely provide alternate Financial Assurance is not subject to Section VI (Temporary Non-Compliance) of this Appendix.  EPA's determination to disallow the Financial Assurance provided by the Self-Assurance Mechanism based on PCS Nitrogen's (or PCS Nitrogen's Guarantor's) independent CPA's adverse or disclaimer opinion based on examination of the financial statement's shall be subject to dispute resolution under Section X (Dispute Resolution) of the Consent Decree, but is not subject to judicial review.

(6)  In addition to complying with LAC 33:V.3707.F and LAC 33:V.3711.F, PCS Nitrogen shall:

(a)  If PCS Nitrogen has a S&P rating of BB-, Moody's rating of Ba3, or an equivalent NRSRO rating and receives a negative outlook posted on one or more of its ratings, or receives a qualified opinion from an independent CPA, or is delisted from an Exchange for any reason other than:  (i) PCS Nitrogen's decision to take the company into private ownership, or (ii) a transaction which results in the acquisition of PCS Nitrogen (or PCS Nitrogen's ultimate parent corporation) by another company subjecting PCS Nitrogen to Section VIII (Business Transactions) of this Appendix, then PCS Nitrogen shall within ten (10) Days of such an event send written notice by certified mail of such event to EPA, and within thirty (30) Days of such notice shall provide an alternate form of Financial Assurance, in compliance with Paragraph 18 of this Appendix.  In the event that the delisting is due to PCS Nitrogen's decision to take the company into private ownership PCS Nitrogen may continue to provide Financial Assurance using the Financial Mechanism(s) already in place if, within twenty (20) Days of the delisting, it provides documentation to EPA from S&P, Moody's or the NRSRO confirming that PCS Nitrogen meets a current S&P Long-Term Issuer Credit Rating, Moody's long-term Corporate Family Rating, or equivalent current rating from an NRSRO, as specified in Paragraph 13 of this Appendix.

(b)  If more than sixty percent (60%) of PCS Nitrogen's Tangible Assets are in the form of one (1) or more note receivables from one (1) or more Related Parties, submit to EPA, when providing the information required by Paragraph 15.e.(3), above, and LAC 33:V.3707.F.5 and LAC 33:V.3711.F.5, an originally-signed CFO Certification, together with a list of each note receivable, the name of the Related Party and a description (along with any necessary documentation) of the Related Party's financial strength, to demonstrate that each Related Party maintains the financial strength to meet its obligation to PCS Nitrogen.

(c)  On a quarterly basis prepare and use financial statements (including balance sheets, income statements, and cash flow statements), compiled by a CPA, evaluate PCS Nitrogen's ability to meet the criteria of the corporate financial test.  This evaluation shall be made available to EPA.  Upon review of the evaluation, EPA can, in its unreviewable discretion (no dispute resolution or judicial review), require that a follow-up evaluation be conducted by a CPA independent of PCS Nitrogen or its Affiliates and/or Related Parties. To meet the criteria involving rolling averages, the averages shall be based on the results as of the end of the same quarter for the prior years (i.e., a three (3)-year rolling average evaluated at the end of the first quarter for Year X shall include the results from the first quarter of Year X-2 and X-1).  In addition, Operating Cash Flow for this evaluation shall be based on the results from the most recent four (4) quarters (i.e., for a first quarter analysis, the Operating Cash Flow shall be based on the results from the second quarter of the previous year through the first quarter of the current year).  The same adjustment shall be made for the OCF metric for prior periods if the criteria involve the use of a rolling average.  The self-evaluation by PCS Nitrogen shall be available to EPA upon request.

(d)  If PCS Nitrogen has an S&P rating of BBB- through BB, a Moody's rating of Baa3 through Ba2, or an equivalent rating from an NRSRO, and receives a negative outlook posted on one or more of its ratings, or receives a qualified opinion rendered by an

27

independent CPA, PCS Nitrogen within thirty (30) Days of such event shall submit to EPA a revised corporate financial test based on the most recent evaluation conducted under Paragraph 15.e.(6)(c), above.

      f.     For the Corporate Guarantee, PCS Nitrogen shall provide a Corporate Guarantee pursuant to and otherwise comply with LAC 33:V.3707.F.10 and LAC 33:V.3711.F.11, as modified by Paragraph 15.e. above, and shall meet the requirements specified below:

      (1)  PCS Nitrogen may use a Non-U.S. Corporation as a Guarantor only if the following conditions are met:  (a) Non-U.S. Corporation meets the requirements of Paragraph 10.f. of this Appendix, and (b) Non-U.S. Corporation has a current rating for either the S&P long-term issuer credit rating of AAA through BBB, Moody's long-term corporate family rating of Aaa though Baa2 or an equivalent rating from an NRSRO that assesses a company's capacity to meet its long-term (greater than one (1) year) financial commitments, as they come due.

      (2)  PCS Nitrogen shall use the exact wording as specified in Form 7, Attachment D of this Appendix, for the Corporate Guarantee.  The certified copy of the Corporate Guarantee must accompany the items sent to EPA, in accordance with Section XIV (Notices) of the Consent Decree, as specified in Paragraph 15.e.(3) of this Appendix.

16.    PCS Nitrogen may submit annually, for EPA approval, a request to use a letter of credit, surety bond guaranteeing payment, or insurance in lieu of the trust fund required under Paragraph 14, above.  PCS Nitrogen shall include in its request documentation demonstrating compliance with Financial Assurance under this Subsection III.B.  PCS Nitrogen may not rely upon the letter of credit, payment surety bond, or insurance to establish compliance with this Appendix until EPA has approved the Third-Party Mechanism.  PCS Nitrogen shall comply with the letter of credit, payment surety bond, or insurance requirements of Paragraph 15 of this Appendix, as applicable.  PCS Nitrogen shall also demonstrate compliance with Paragraph 11 of this Appendix. EPA's determination whether or not to accept PCS Nitrogen's request is subject to dispute resolution pursuant to Section X (Dispute Resolution) of the Consent Decree, but is not subject to judicial review.

17.    PCS Nitrogen may submit annually, for EPA approval, a request to use multiple Third-Party Mechanisms (i.e., trust fund, letter of credit, surety bond guaranteeing payment, and insurance) in conjunction with a Self-Assurance Mechanism, together with supporting documentation, to demonstrate Financial Assurance for Stack System Closure and Long-Term Care.  PCS Nitrogen shall not rely upon the additional Third-Party Mechanism to establish compliance with this Consent Decree until EPA has approved the additional Third-Party Mechanism.  PCS Nitrogen shall also demonstrate compliance with Paragraph 11 of this Appendix.  EPA's determination whether or not to accept PCS Nitrogen's request is subject to dispute resolution under Section X (Dispute Resolution) of the Consent Decree, but is not subject to judicial review.

18.    If PCS Nitrogen at any time becomes ineligible to rely on a Self-Assurance Mechanism pursuant to this Section III.B, and cannot re-establish such eligibility pursuant to Section VI (Temporary Non-Compliance) and/or Section VII (Compliance Schedule) of this Appendix, then

PCS Nitrogen shall establish alternate Financial Assurance based on Current Dollars by:
(a) maintaining the existing Financial Assurance in the trust fund (or as approved, other Third-Party Mechanism) as established pursuant to Paragraph 14; (b) providing additional Financial Assurance using Third-Party Mechanism(s) pursuant to Paragraphs 10.a-d; and (c) meeting the requirements of Paragraph 11 of this Appendix when providing more than one Financial Mechanism.  If PCS Nitrogen meets the above requirements and EPA approves the alternate Financial Assurance (including the termination of a Corporate Guarantee if provided), PCS Nitrogen does not need to meet the requirements of Paragraph 15 of this Appendix.  PCS Nitrogen shall continue to be subject to Section III.B (Type B Financial Assurance), as set forth in this Paragraph 18, unless EPA approves a request to change to Section III.A (Type A Financial Assurance) pursuant to Paragraph 7 of this Appendix.

19.     If the Cost Estimate at the commencement of PCS Nitrogen's fiscal year is less than or equal to the value of the following Third-Party Mechanism(s), trust fund or insurance, then PCS Nitrogen may draw upon the Third-Party Mechanism(s) to pay for Stack System Closure and Long-Term Care.  Otherwise, PCS Nitrogen shall first draw upon the resources of the Self-Assurance Mechanism before drawing upon a Third-Party Mechanism to pay for Stack System Closure or Long-Term Care.  If EPA approves the use of multiple Third-Party Mechanisms under Paragraph 17, above, EPA will designate the priority for drawing on the Third-Party Mechanisms and EPA's designation shall not be subject to dispute resolution pursuant to Section X (Dispute Resolution) of the Consent Decree, and shall not be subject to judicial review.

IV.  Financial Assurance for Third-Party Liability

20.     Within thirty (30) Days of the Effective Date of the Consent Decree, and on the first Anniversary Date and annually thereafter, PCS Nitrogen's CFO shall provide to EPA a Financial Mechanism for Third-Party liability along with an originally-signed CFO Certification, together with supporting documentation, confirming that it has established Financial Assurance to compensate a Third Party for bodily injury or property damage that might result from sudden accidental or non-sudden accidental occurrences associated with Stack System Closure and/or Long-Term Care at the Facility ("Financial Assurance for Third-Party Liability").  PCS Nitrogen shall provide Financial Assurance for Third-Party Liability for the duration of Stack System Closure pursuant to LAC 33:V.3715.A and B and also for the duration of Long-Term Care, and otherwise comply with LAC 33:V.3715, except as provided in Paragraph 21, below.  If PCS Nitrogen wishes to propose an adjustment to the amount of Financial Assurance pursuant to LAC 33:V.3715.C, PCS Nitrogen shall submit to EPA for approval an originally-signed CFO Certification explaining the basis for the proposed adjustment, together with supporting documentation demonstrating that an adjustment is appropriate under LAC 33:V.3715.C.  Until such time as EPA approves the adjusted Financial Assurance in writing, PCS Nitrogen shall provide Financial Assurance for Third-Party Liability as otherwise required herein.  Nothing in this Paragraph shall be construed to waive or limit EPA's right, pursuant to LAC 33:V.3715.D, to adjust the level of Financial Assurance required in LAC 33:V.3715.A and B.  EPA's determination of whether or not to approve PCS Nitrogen's request under LAC 33:V.3715.C is subject to dispute resolution under Section X (Dispute Resolution) of the Consent Decree, but not judicial review.

21.    PCS Nitrogen's Financial Assurance for Third-Party Liability shall comply with LAC 33:V.3715.A-B and F-J and LAC 33:V.3719.G, H.2 and I-N, and as modified by this Paragraph. If PCS Nitrogen is using a trust fund, letter of credit, or surety bond, the Trustee of any trust fund, or the provider of any letter of credit, or surety bond shall not be a Related Party to PCS Nitrogen. Unless EPA provides an alternate form, PCS Nitrogen shall word the Financial Mechanism as specified in LAC 33:V.3719, except the term "facility" shall substitute for the phrase "hazardous waste facility."

    a.    For a surety bond or for insurance, PCS Nitrogen shall demonstrate that the surety and the insurer have at least a "secured" financial strength rating of "A" by A.M. Best or an equivalent rating by an NRSRO or meet the requirements of 10.b.2.  Such demonstration shall be in the form of an originally-signed CFO Certification or certification by an officer of A.M. Best or the NRSRO.  For insurance, PCS Nitrogen shall use the exact wording as specified in Form 9, Attachment D of this Appendix for the Certificate of Insurance.

    b.    For a letter of credit, PCS Nitrogen shall ensure that the provider of the letter of credit is a federally insured financial institution or meets the qualifications set forth in Paragraph 10.c.1.

    c.    For the corporate financial test, PCS Nitrogen shall:

    (1)  In lieu of complying with LAC 33:V.3715.F.1.b.i use the current rating for either the S&P Long-Term Issuer Credit Rating or Moody's long-term Corporate Family Rating which assesses a company's capacity to meet its long-term (greater than one (1) year) financial commitments, as they come due.

    (2)  In lieu of complying with  LAC 33:V.3715.F.3 demonstrate that it meets the corporate financial test by submitting the following to EPA thirty (30) Days after the Effective Date of the Consent Decree, and on the first Anniversary Date and annually thereafter:

    (a)  A letter signed by PCS Nitrogen's CFO and as worded in LAC 33:V.3719.G ("CFO TPL Letter").

    (b)  A copy of the independent CPA's report on examination of PCS Nitrogen's audited financial statements for the latest completed fiscal year.

    (c)  A copy of the Independently Audited financial statements for the last completed year (which may be submitted subject to a claim of Confidential Business Information consistent with state and federal laws and Paragraph 69 of the Consent Decree if such financial statements are those of a  private company).

    (d)  A report of procedures and findings from PCS Nitrogen's independent CPA, resulting from an agreed-upon procedures engagement performed in accordance with the AICPA Statement on Standards for Attestation Engagements, AT Section 201 - Agreed Upon Procedures Engagements (including AICPA related attestation interpretations), as updated, that describes the procedures performed and related findings, including whether or not differences or discrepancies were found in the comparison of financial information

30

included in the letter (including attachments and exhibits) from PCS Nitrogen's CFO and PCS Nitrogen's Independently Audited, year-end financial statements for the last fiscal year, including all attachments.  Where differences or discrepancies exist between PCS Nitrogen's CFO TPL Letter and PCS Nitrogen's Independently Audited year-end financial statements, the report of procedures and findings will reconcile any differences or discrepancies between the values or information represented in PCS Nitrogen's CFO TPL Letter and PCS Nitrogen's Independently Audited financial statements.  Procedures to be performed by the independent CPA shall be in accordance with AT Section 201.

       d.     For a Corporate Guarantee, PCS Nitrogen shall provide a Corporate Guarantee and otherwise comply with LAC 33:V.3719.G, as modified by Paragraph 21.c., above, and shall meet the requirements specified below:

       (1)  Submit the documents required under Paragraph 21.c.(2) to EPA thirty (30) Days after the Effective Date of the Consent Decree, and on the first Anniversary Date and annually thereafter;

       (2)  Use the exact wording as specified in Form 8-A, Attachment D of this Appendix, for the CFO TPL Letter; and

       (3)  Provide a written Guarantee using the exact wording specified in Form 8-B, Attachment D of this Appendix.

V.  <u>Information Gathering</u>

22.    For purposes of Appendix 2, information gathering shall be governed by Section XI of the Consent Decree unless otherwise specified in this Appendix.

VI.  <u>Temporary Non-Compliance</u>

23.    If PCS Nitrogen determines that it has violated or may violate any requirement of this Appendix, PCS Nitrogen shall follow the procedures below.  Any dispute raised by PCS Nitrogen regarding EPA's refusal to approve a plan under this Paragraph shall not prohibit EPA from accessing existing Financial Assurance.  If PCS Nitrogen fails to meet a compliance schedule or the terms of a compliance plan under this Appendix:  (1) PCS Nitrogen shall be deemed without Financial Assurance for purposes of enforcement, and (ii) EPA shall not be precluded from accessing or collecting existing Financial Assurance.

       a.     For all non-compliances or anticipated non-compliances of this Appendix, PCS Nitrogen shall, within ten (10) Days of the non-compliance determination, submit to EPA, for approval, an originally-signed CFO Certification together with supporting documentation, explaining in detail the nature of the violation and stating whether or not the non-compliance can be rectified by PCS Nitrogen within thirty (30) Days.  If PCS Nitrogen does not believe that it can rectify the non-compliance within thirty (30) Days, then within ten (10) Days of its notice, PCS Nitrogen shall submit to EPA, for approval, a plan and schedule for correcting the violation.  If applicable, such a plan shall include additional or alternate Financial Assurance.  In the event that alternate or additional Financial Assurance is a component of the plan and schedule, then the

Financial Assurance shall be provided as soon as possible, but no later than sixty (60) Days after PCS Nitrogen's notice of PCS Nitrogen's non-compliance. PCS Nitrogen may request additional time to provide the alternate or additional Financial Assurance and such request shall include a detailed explanation and supporting documentation.

       b.      EPA's determination of whether or not to approve PCS Nitrogen's plan and/or schedule for correcting the violation(s) is subject to dispute resolution under Section X (Dispute Resolution) of the Consent Decree, but not judicial review. The time frames for notices and submissions under Section X (Dispute Resolution) of this Consent Decree shall be reduced by half for any plan requiring alternate or additional Financial Assurance.

24.     PCS Nitrogen shall not be subject to stipulated penalties pursuant to Section VIII (Stipulated Penalties) of the Consent Decree for temporary non-compliance with this Appendix provided that: (a) PCS Nitrogen complies with the notice and submittal requirements of Paragraph 23, above; (b) EPA approves the plan and schedule for correcting the violation, including any additional or alternative Financial Assurance; (c) PCS Nitrogen within ten (10) Days of EPA's approval commences the correction of the violation in accordance with the approved schedule, including if applicable the establishment of any additional or an alternate form of Financial Assurance; and (d) EPA determines that PCS Nitrogen's violation is not due to PCS Nitrogen's lack of diligence or good faith (the burden of proving this shall rest with PCS Nitrogen).

## VII.  Compliance Schedule

25.     In the event that PCS Nitrogen is providing Financial Assurance pursuant to Section III.B (Type B Financial Assurance) and notifies EPA pursuant to Paragraph 15.e.(4), above, that PCS Nitrogen (or PCS Nitrogen's Guarantor) no longer satisfies the corporate financial test criteria due to information that has come to its attention pursuant to Paragraph 15.e.(6)(c), above, PCS Nitrogen within ten (10) Days of such notice shall provide additional or alternate Financial Assurance as set forth below:

       a.      If PCS Nitrogen fails to satisfy the corporate financial test criteria and requirements of Paragraph 15.e., above, for each quarter in a given fiscal year (not including the fourth quarter (i.e., fiscal year-end)), except as provided in Paragraph 25.b., below, PCS Nitrogen shall increase the face value or the corpus of the Third-Party Mechanism by twenty-five percent (25%). If PCS Nitrogen can satisfy the corporate financial test criteria by the fiscal year-end (i.e., in its annual submission pursuant to Paragraph 15.e.(3), above) and PCS Nitrogen's quarterly review under Paragraph 15.e.(6)(b) for the following fiscal year does not result in notification from PCS Nitrogen that it does not satisfy the corporate financial test, PCS Nitrogen can request and EPA will authorize the release of funds or a reduction in the value of the Third-Party Mechanism commensurate with the contemporaneous Cost Estimate and requirements of Paragraph 15.e. of this Appendix.

       b.      If PCS Nitrogen fails to satisfy the corporate financial test criteria and requirements of Paragraph 15.e., above, for any two (2) consecutive quarters in a given fiscal year (not including the fourth quarter (i.e., fiscal year-end)), PCS Nitrogen shall provide alternate

Financial Assurance in accordance with Paragraph 18 of this Appendix. If PCS Nitrogen can satisfy the corporate financial test criteria by the fiscal year-end (i.e., in its annual submission pursuant to Paragraph 15.e.(3)) and its annual submissions pursuant to Paragraph 15.e.(3), above, for the following two (2) fiscal years do not trigger Paragraphs 15.e.(4) or 15.e.(5), above, EPA upon PCS Nitrogen's request will authorize a release of the funds or a reduction in the value of the Third-Party Mechanism(s) so that the value of the Third-Party Mechanism is commensurate with the minimum threshold funding for a Third-Party Mechanism as specified in Attachment E to this Appendix plus an additional twenty-five percent (25%) of the Cost Estimate.

c.    PCS Nitrogen shall be deemed to be without Financial Assurance for purposes of enforcement (but not for accessing Financial Assurance should it be necessary) if PCS Nitrogen fails to meet a compliance schedule. Failure to timely comply with a compliance schedule or to provide alternate Financial Assurance pursuant to this Section VII (Compliance Schedule) is not subject to the provisions of Section VI (Temporary Non-Compliance) of this Appendix. Any dispute raised by PCS Nitrogen under this Section shall be subject to dispute resolution under Section X (Dispute Resolution) of the Consent Decree, but not judicial review.

VIII.  Business Transactions

26.    No transfer of ownership or operation of a Facility shall relieve PCS Nitrogen of its Financial Assurance obligations under this Consent Decree, except as provided by this Section VIII and by Section IX (Force Majeure) and Section II (Applicability) of the Consent Decree.

27.    At least thirty (30) Days prior to any transfer, PCS Nitrogen shall submit to EPA information explaining the proposed transfer in detail and stating whether PCS Nitrogen requests the transfer of its Financial Assurance responsibilities to the transferee pursuant to Section II (Applicability) of the Consent Decree and Paragraph 28.b, below.

28.    In the event that PCS Nitrogen transfers ownership or operation of all or a portion of the Facility (i.e., areas that are located inside the footprint of the Phosphogypsum Stack System of the Facility or otherwise subject to activities included in the Cost Estimate and subject to Financial Assurance obligations):

a.    If PCS Nitrogen is to retain its Financial Assurance obligations upon the transfer of ownership or operation of all or a portion of the Facility, PCS Nitrogen, based on a Cost Estimate in Current Dollars, shall establish and fund a trust fund, or obtain a surety bond or letter of credit in accordance with this Appendix. Any existing trust fund established pursuant to this Appendix shall remain in place. PCS Nitrogen shall provide EPA the appropriate documentation evidencing the trust fund, surety bond, or letter of credit by the date of the Facility transfer. If using a trust fund, the portion of funds vested in the trust fund that are not required to meet annual withdrawals shall be invested in U.S. Treasury Bills, or market-based notes and bills that achieve an investment goal or preservation of principle and guarantee an inflation-adjusted rate of return no less than the 30-Year Treasury Constant Maturity Rate average for the previous twelve (12) months from the date of the annual Cost Estimate. If PCS Nitrogen wishes to propose alternate Financial Mechanism(s) in lieu of the trust fund, surety bond, or letter of credit, PCS Nitrogen at least thirty (30) Days prior to the transfer shall submit an originally-signed CFO Certification,

33

together with supporting documentation, explaining the compelling reasons why the proposed alternate Financial Mechanism is being requested and is an equivalent substitute for the trust fund, surety bond, or letter of credit.  Upon EPA's approval, PCS Nitrogen shall establish the approved Financial Assurance by the date of the transfer or within ten (10) Days of EPA's approval, whichever is later.  If by the date of the transfer, EPA denies such a request or if PCS Nitrogen has not put in place the approved Financial Assurance, then PCS Nitrogen shall fully fund the trust fund or obtain a surety bond or letter of credit, by the date of transfer as described above. EPA's determination to approve (or disapprove) PCS Nitrogen's proposal to use an alternate Financial Mechanism shall be subject to dispute resolution pursuant to Section X (Dispute Resolution), but shall not be subject to judicial review).

    b.    If transferee agrees to assume PCS Nitrogen's Financial Assurance obligations, PCS Nitrogen shall submit to EPA for approval an originally-signed certification by transferee's CFO, together with supporting documentation, explaining in detail its ability to provide Financial Assurance pursuant to the requirements of this Appendix and agreeing to provide the Financial Assurance if approved by EPA pursuant to Section II (Applicability) of the Consent Decree.  PCS Nitrogen shall comply with the requirements of Paragraph 28.a., above, until:  (1) EPA has approved the transferee's proposed Financial Assurance; (2) the United States, after consultation with Louisiana, consents to the transfer of obligations pursuant to Section II (Applicability) of the Consent Decree; (3) transferee has established the approved Financial Assurance; and (4) EPA has given its consent for PCS Nitrogen to terminate its Financial Assurance.

29.    If PCS Nitrogen is providing Financial Assurance through the use of any Financial Mechanism other than the exclusive use of a fully funded trust fund in Current Dollars, in the event of a business transaction that results, or PCS Nitrogen determines will result, in an adverse material change to PCS Nitrogen's financial or corporate structure such that PCS Nitrogen or its successor (or a Guarantor of PCS Nitrogen or its successor) has insufficient Operating Cash Flow or Tangible Assets to cover the long-term (greater than one (1) year) financial liabilities as represented on PCS Nitrogen's or successor's audited balance sheet and to comply with the Financial Assurance requirements of this Consent Decree, PCS Nitrogen shall provide notice to EPA within fourteen (14) Days of identifying such adverse material change and comply with the requirements for Financial Assurance in Paragraph 28.a., above.

IX.  Reservation of Rights

30.    If EPA determines at any time that the Financial Assurance provided by PCS Nitrogen no longer satisfies the requirements of this Consent Decree, it shall notify PCS Nitrogen.  EPA may base this determination on PCS Nitrogen's failure to provide notices or documentation required by this Appendix as well as on a substantive evaluation of PCS Nitrogen's Financial Assurance. As soon as possible, but at least within sixty (60) Days of written notice from EPA that PCS Nitrogen's Financial Assurance no longer satisfies the requirements of this Consent Decree, PCS Nitrogen shall submit to EPA for approval revised or alternate Financial Assurance that satisfies the requirements of this Consent Decree.  PCS Nitrogen shall not cancel the existing Financial Assurance until the revised or alternate Financial Assurance has been approved by EPA and EPA has provided written consent permitting PCS Nitrogen to cancel the existing Financial Assurance. Failure to timely provide alternative Financial Assurance as required by this Section (or any

Paragraph of this Appendix that references this Section) is not subject to the provisions of Section VII of this Appendix.  EPA's determinations pursuant to this Paragraph shall be subject to dispute resolution pursuant to Section X (Dispute Resolution) of this Consent Decree, but not judicial review, and the time frames for notices and submissions under the dispute resolution process shall be reduced by half (e.g., under Informal Dispute Resolution PCS Nitrogen shall submit its Notice of Dispute within fifteen (15) Days).

31.     Within sixty (60) Days after receiving certification from PCS Nitrogen and a qualified professional Engineer in accordance with Section IV of Attachment D, Appendix 1 of the Consent Decree, that Long-Term Care has been completed in accordance with the approved Permanent Closure Plan, EPA will notify PCS Nitrogen that it is no longer required to maintain Financial Assurance pursuant to Sections III and IV of this Appendix, unless EPA has reason to believe that Long-Term Care has not been completed in accordance with the approved Permanent Closure Plan.  EPA shall provide PCS Nitrogen a detailed written statement of any such reason to believe that Long-Term Care has not been completed in accordance with the approved Permanent Closure Plan.